**UNITED STATES of America,**
**Plaintiff,**

v.

**FALLBROOK PUBLIC UTILITY DIS-**
**TRICT et al., Defendants.**

**No. 1247–SD.**

United States District Court
S. D. California, S. D.

Aug. 8, 1958.

William H. Veeder, Atty., Dept. of Justice, Washington, D. C., for the United States.

George G. Grover, Corona, Cal., for William W. Cottle and Katharine C. Gibbon.

W. B. Dennis, Fallbrook, Cal., for Santa Margarita Mut. Water Co.

Adolphus Moskovitz, Deputy Atty. Gen., for State of California.

George Stahlman, Fallbrook, Cal., for Vail Co.

Franz Sachse, Fallbrook, Cal., Phil Swing, San Diego, Cal., for Fallbrook Public Utility Dist.

JAMES M. CARTER, District Judge.

Prior to the beginning of the trial in this action, now set for October 1, 1958, extensive pretrial has been conducted, various legal propositions and motions have been briefed and argued. The court now proposes to rule on the motions, to determine certain of the legal principles to be applied during the trial and set forth its reasons and the applicable authorities.

A pretrial stipulation as to the facts not in controversy was executed by the major parties and approved by the court. It does not bind non-signatories, but a procedure has been devised so that in hearings before the court and the Master, the facts contained in the stipulation and pretrial order will be presented in summary form as evidence. Any party may offer evidence to controvert them.

Unless controverted and disapproved, the court and the Master propose to find in accord with such facts in the pretrial order.

## I

### History of the Litigation

The history of the litigation, commenced in 1951, appears in the following reported cases.

United States v. Fallbrook Public Utility District, D.C.1951, 101 F.Supp. 298 (Complaint states a cause of action; State of California permitted to intervene);

United States v. Fallbrook Public Utility District, D.C.1952, 108 F.Supp. 72 (Pretrial order and Rulings on legal proposition);

United States v. Fallbrook Public Utility District, D.C.1952, 109 F.Supp. 28 (Decision after trial is to defendants, Santa Margarita Mutual Water Co. & State of California);

United States v. Fallbrook Public Utility District, D.C.1953, 110 F.Supp. 767 (Findings, conclusions and judgment pursuant to decision in 109 F.Supp. 28);

Fallbrook Public Utility District v. United States District Court, 9 Cir., 1953, 202 F.2d 942 (Mandamus proceeding in Circuit);

People of State of California v. United States, 9 Cir., 1956, 235 F.2d 647.

(Reversal of partial judgment shown in 110 F.Supp. 767).

## II

### The Stipulation of November 29, 1951

The following stipulation was entered into between the United States and the State of California on November 29, 1951. Note that it is "for the benefit of all the parties to this cause."

In the United States District Court

In and for the Southern District of California

Southern Division

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>v.<br>Fallbrook Public Utility District, a public service corporation of the State of California, et al.,<br>Defendants,<br>People of the State of California,<br>Defendants in Intervention. | Civil No. 1247<br>Stipulation |

On the 15th day of August, 1951, the People of the State of California, in accordance with invitation of the United States of America, petitioned this Court to intervene in this litigation. On that date an Order was allowed and entered by this Court granting the Petition.

For the clarification of the issues in this litigation, and for the benefit of all of the parties to this cause, it is hereby stipulated:

### I

That in Paragraphs VIII and IX of plaintiff's Complaint herein, and in Paragraphs 2 and 3 of the Prayer of said Complaint, the word "paramount" is used in the same sense in which that word is used in the second paragraph, on page 374 of the opinion of the Supreme Court of California in the case of Peabody v. City of Vallejo, 2 Cal.2d 351 (fourth paragraph on page 494, 40 P.2d 486).

### II

That in this cause, the United States of America claims only such rights to the use of water as it acquired when it purchased the Rancho Santa Margarita, together with any rights to the use of water which it may have gained by prescription or use, or both, since its acquisition of the Rancho Santa Margarita.

### III

That the United States of America claims by reason of its sovereign status no right to the use of a greater quantity of water than is stated in Paragraph II, hereof.

### IV

That the rights of the United States of America to the use of water herein are to be measured in accordance with the laws of the State of California.

### V

That the parties to this Stipulation will request the entry of a Pretrial Order by this Court defining the issues in this cause, in conformity with the statements contained in this Stipulation.

### VI

That there will be a full, complete and mutual exchange of data and informa-

tion as to the subject matter of this cause collected by the respective parties to this Stipulation, including data respecting the issuance of any permits or licenses issued by the State of California in connection with the rights to the use of water of the Santa Margarita River.

Such exchange of information by the United States, will be subject to clearance by the Commanding Officer, Camp Joseph H. Pendleton, in respect to military security, as determined by said officer.

Dated: November 29, 1951.

| | |
|---|---|
| Ernest A. Tolin, | Edmund G. Brown |
| United States Attorney | Edmund G. Brown, Attorney General |
| Betty Marshall Graydon | of the State of California |
| Assistant United States | |
| Attorney | Arvin B. Shaw, Jr. |
| William H. Veeder, | Arvin B. Shaw, Jr. |
| Special Assistant to the Attorney General of the United States | Assistant Attorney General |
| | B. Abbott Goldberg |
| By | B. Abbott Goldberg, |
| | Deputy Attorney General |
| William H. Veeder | Attorneys for the People of the State |
| William H. Veeder | of California |

---

### III

### The Court's Interpretation of the Stipulation of 11/29/51

On January 6, 1958, during pretrial, the United States brought on for hearing a motion for an order declaring the stipulation binding as to the signatories, the United States and State of California, and that the court declare the "stipulation have ascribed to it the usual meaning of the terms set forth in it." Prior to decision of the motion, the Fallbrook P. U. D. and the Santa Margarita Mutual Water Company, with the consent of the United States and the State of California, joined into the stipulation.

The court granted the motion of the United States, declared the stipulation binding and set forth the meaning of the stipulation by written order dated February 11, 1958, which follows:

In the United States District Court

Southern District of California

Southern Division

| | |
|---|---|
| United States of America, Plaintiff, | No. 1247–SD–C |
| v. Fallbrook Public Utility District, a public service corporation of the State of California; et al., Defendants, People of the State of California, Defendants in Intervention | Order Respecting Binding Effect and Meaning of Stipulation Dated November 29, 1951, Originally Entered Between the United States and the State of California |

The United States having made a motion on January 6, 1958, for an order of this Court declaring (1) that the stipulation dated November 29, 1951, originally entered between the United States and the State of California, a copy of which is attached and by reference made a part of this order, is binding upon the parties thereto, and (2) that the stipulation should have ascribed to it the usual meaning of the terms set forth in it; and

The Fallbrook Public Utility District and the Santa Margarita Mutual Water Company having on January 6, 1958, declared in open court their desire to be parties to the stipulation, and the United States and the State of California having on January 6, 1958, declared in open court their agreement to the Fallbrook Public Utility District and the Santa Margarita Mutual Water Company becoming parties thereto; and

The State of California, the Fallbrook Public Utility District and the Santa Margarita Mutual Water Company having on January 6, 1958, expressed in open court their support of the motion of the United States, but having disagreed with the United States as to what meaning should be ascribed to the stipulation; and

This Court (1) having considered written points and authorities and oral argument by the parties to the stipulation regarding the meaning thereof; (2) having taken judicial notice of the furor concerning the nature of the claims of the United States in this action which existed when this action was originally filed; and (3) having considered testimony by the Attorney General of the United States to Congressional committees after the stipulation was entered into, stating his interpretation thereof;

Now, Therefore, It Is Ruled and Ordered as Follows:

I

The stipulation dated November 29, 1951, is binding upon the parties thereto, which are the United States, the State of California, the Fallbrook Public Utility District and the Santa Margarita Mutual Water Company.

II

The stipulation is unambiguous.

III

Paragraph I of the stipulation, the meaning of which is not in dispute among the parties, defines the word "paramount", as used in the complaint in this action, as being used in the same sense as in the opinion in the case of Peabody v. City of Vallejo, 2 Cal.2d 351, 40 P.2d 486, and therefore as having no reference to the sovereign character of the United States.

IV

Paragraphs II, III and IV of the stipulation must be read together and when so read have the following meaning:

A. Paragraph II of the stipulation lists and restricts the rights claimed in this action by the United States to be as follows:

1. The rights to the use of water which the United States acquired when it purchased the Rancho Santa Margarita. Such rights are the same rights, no more and no less, than the Rancho had, and hence the United States acquired the same rights as any private party who might have purchased the Rancho.

2. Any rights which the United States may have gained since its acquisition of the Rancho Santa Margarita by prescription or use or both.

a. This excludes any claims to rights which the United States may believe it already owned prior to its acquisition of the Rancho, such as rights which the United States has asserted arise from its ownership of the public domain. Paragraphs III and IV of the stipulation reinforce the conclusion that claims of rights asserted to arise from the ownership of the public domain are exclud-

ed, since such claims would be based on the sovereign character of the United States and the laws of the United States rather than the laws of the State of California.

b. The rights gained by "prescription" which the United States may claim under this Paragraph II, are only such rights as might have been acquired by acts adverse to rights belonging to others.

c. Because the word "use" is a very broad term, the rights gained by "use", which the United States may claim under this Paragraph II, include rights by "appropriation" as well as other kinds of rights that may arise by use, limited, however, because of Paragraph IV of the stipulation, to such rights by use as may be acquired under the laws of the State of California. Excluded, therefore, are claims by the United States of rights acquired by inverse condemnation, since the law by which such rights would be measured is federal law as set forth in decisions of federal courts involving inverse condemnation by the United States and not California law.

B. Paragraph III of the stipulation is a disclaimer by the United States that by reason of its sovereign status it has rights to a greater quantity of water than a person not a sovereign would have, standing in the position of the United States.

C. Paragraph IV of the stipulation means that the measure of the rights claimed by the United States in this action is all the laws of the State of California pertaining to water rights. Among them are the laws relating to riparian rights, to prescriptive rights, and to appropriative rights, including the method and procedure established by California law for the acquisition of appropriative rights.

Dated: Feb. 11, 1958

James M. Carter
James M. Carter
United States District Judge

At the hearing, William H. Veeder, attorney in the Department of Justice, asserted the stipulation was not ambiguous, and offered no evidence to explain it. Nor did any other party contend it was ambiguous.

The court therefore did not consider statements of officials of the United States to the Congress, made *prior* to the date of the stipulation—but did consider similar statements made after its execution. Such statements demonstrated that the Attorney General of the United States gave the same meaning to the stipulation, as ascribed to it by this court. Former Attorney General Brownell testifying before Congress in 1953 declared:

" * * * This is the stipulation [November 29, 1951] into which all the parties have entered, including the Attorney General and the State of California:

" 'That in this cause the United States of America claims only such rights to the use of water as it acquired when it purchased the ranch, together with any rights to the use of water which it may have gained by prescription or use by (sic) both since its acquisition.

" '(3) That the United States of America claims, by reason of its sovereign status, no rights to the use of a greater quantity of water than is stated in paragraph 2.'

"That is binding on the United States and we claim no other or further rights. The stipulation goes on to say:

" 'That the rights of the United States to the use of water herein are to be measured in accordance with the laws of the State of California.' " (Supplemental Hearing on State, Justice, and Commerce Appropriations for 1954, Friday, May 15, 1953, page 20.)

The foregoing quotation was set forth in the memorandum of the United States in support of its motion.

David W. Agnew, Attorney for Bureau of Yards and Docks, U. S. Navy and one of the attorneys who signed the original complaint in this action, at a hearing before the Senate Committee on Interior and Insular Affairs in HR 5368 and S 2809—on July 1 and 2, 1952, stated:

"Mr. Agnew: My name is David W. Agnew. I am an attorney in the Bureau of Yards and Docks, the Department of the Navy. (p. 92)

*"The suit was instituted to quiet the Government's title to such right as it acquired at the time it acquired the Rancho Santa Margarita.*

*"We do not assert and never have that because those rights are owned by the United States that we are entitled to any greater rights in the use of water from that stream than our predecessor in title.* (pp. 93–94) (Emphasis added.) * *

"I am not contending, Mr. Engle, that we own a bit more water than we acquired when we purchased the Rancho Santa Margarita (p. 97)" * * *

"Representative Poulson: Will the gentlemen yield? If you claim waters, on what basis are you going to claim your rights if you do not rely upon the State—

"Mr. Agnew: *We rely on the State law in this case, Mr. Poulson, entirely.* I think the record in the suit is clear (p. 98). (Emphasis added.)

"Mr. Agnew: Mr. Engle, we have said that as to the quantity of water to which the Government may be entitled, we come in strictly under the California law (p. 99) * * *'"

In the memorandum filed 12/30/57 (supra) Mr. Veeder stated, concerning the stipulation:

"Congress has been fully apprised of it; has made numerous references to it; at no time acted to refute it or deny the binding effect of it." * * *

 When the parties, after the execution of an agreement, by their statements and conduct place a definite interpretation upon it, such interpretation binds them.

"A construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court," Woodbine v. Van Horn, 29 Cal.2d 95, 104, 173 P.2d 17, 22; Barham v. Barham, 1949, 33 Cal.2d 416, 423, 202 P.2d 289; Gillespie v. City of Los Angeles, 1950, 36 Cal.2d 553, 561, 225 P.2d 522.

## IV

### The Supplemental Order of April 8, 1958

Thereafter, the question was raised as to the scope of the stipulation and particularly whether it applied to the lands included for the first time, in the government's amended complaint,—(1) the Indian reservations, (2) the National forests, and (3) the public domain.

The following supplemental order was made on April 8, 1958.

In the United States District Court

Southern District of California

Southern Division

| United States of America, Plaintiff, v. Fallbrook Public Utility District, et al., Defendants, People of the State of California, Defendants in Intervention. | No. 1247–SD–C Supplemental Order Respecting Binding Effect and Meaning of Stipulation Dated November 29, 1951, Entered into between the United States of America and the State of California |

There was entered by this Court on the 11th day of February, 1958, an order respecting the effect and meaning of the stipulation of November 29, 1951, between the United States of America and the State of California.

Objections to that order and the interpretation of the stipulation contained in it were made and reserved by the United States of America. Moreover, a question having been raised as to the scope of the order referred to above, it is desirable to limit and define its application.

Now, Therefore, It Is Hereby Ordered That:

(a) The stipulation of November 29, 1951, referred to in this order and the order of February 11, 1958, is strictly limited to the approximately 133,000 acres of land in San Diego County, California, acquired by the United States of America from the Rancho Santa Margarita and which now constitute the sites for Camp Pendelton, the United States Naval Ammunition Depot and the United States Naval Hospital, and to the rights to the use of water acquired by the United States of America from the Rancho Santa Margarita, together with any rights to the use of water it may have gained by prescription or use or both since its acquisition of the Rancho Santa Margarita.

(b) No other lands or rights to the use of water claimed by the United States of America in this litigation will be subject to or bound by the stipulation of November 29, 1951, and insofar as lands other than those referred to in paragraph (a) above are concerned, this cause will be tried as though neither the stipulation of November 29, 1951, had been entered into nor the order of February 11, 1958, entered by this Court.

(c) The United States of America disclaims any right to augment its rights to the use of water claimed by it in connection with Camp Pendleton, the United States Naval Ammunition Depot and the United States Naval Hospital by reason of its rights to the use of water, claimed in connection with its other land in the watershed of the Santa Margarita River.

(d) Prescriptive rights to the use of water claimed by the United States of America will be based upon and be determined pursuant to the laws of the State of California. The term "prescriptive rights" as used in this paragraph relates to the acquisition of rights by adverse possession as distinguished from any other means of acquiring rights such as by inverse condemnation.

Dated. April 8, 1958
James M. Carter
James M. Carter
United States District Judge

V

Motion to Reconsider Court's Ruling of 2/11/58 on Meaning of the Stipulation of Nov. 29, 1951

By motion filed May 12, 1958, the United States moved the court to reconsider its ruling of February 11, 1958, on the stipulation and amend that order "to conform with the intention of the parties" and averred, "there must be full, complete and true disclosure respecting the circumstances, facts and intentions of the parties" at the time of the execution of the stipulation on November 29, 1951; and by a second motion filed the same day that the court take the testimony of B. Abbott Goldberg and Adolphus Moscovitz, Deputy Attorneys General of the State of California and on the basis of such testimony that the court reconsider its order of February 11th, and revise the order to comply with the intentions of the parties.

In the motions, although not particularly stressed by Mr. Veeder in arguing the motion, was the following language:

" * * * it is evident that at the time of the execution of the stipulation the State of California well knew that the representative of the United States, did not, indeed *could not* stipulate away the 'sovereign status' of the United States" * * * [Emphasis added]

and "the United States respectfully asserts as revealed by Goldberg's statements set out in Exhibit A, that the representative of the United States did not, in fact *was without power* to stipulate in a manner which would require the United States of America to comply with California's laws respecting the appropriation of rights to the use of water" * * * [Emphasis added] and " * * the representative of the United States of America did not, indeed *could not* stipulate away the sovereign status of the National government" * * * [Emphasis added.]

This problem we discuss later.

The motion was heard by the court on May 22, 1958. The original stipulation of November 29, 1951, was signed for the State of California by Edmund G. Brown, Attorney General, Arvin B. Shaw, Jr., Assistant Attorney General and B. Abbott Goldberg, Deputy Attorney General and for the United States by William H. Veeder.

(1) *Evidence Presented on the Motion*

Veeder and Goldberg were present in the court room; Shaw was dead. Moscovitz, who was referred to in the motions as a prospective witness, was also present. The government did not call Veeder or Moscovitz to the stand but called only Goldberg. The court heard his testimony. A summary of the testimony is annexed hereto as *Appendix A*.

At the hearing on the motion it was stipulated that a transcript of a proceeding before the District Court in this case on December 3, 1951 would be part of the record.

(2) *Transcript of the Court Hearing December 3, 1951*

On December 3, 1951, 5 days after the stipulation of November 29, 1951 was executed, a hearing was held before the Honorable Jacob Weinberger, U. S. District Judge on plaintiff's motion for a separate trial as to issues in the case concerning Fallbrook and certain other of the major defendants. Present and participating were Mr. Veeder and Mr. Goldberg. Mr. Veeder's and Mr. Goldberg's statements at that time, as officers of the court, should be contrasted with the testimony of Mr. Goldberg and the position of Mr. Veeder on the motion.

From reading the transcript of December 3, 1951, it is apparent that what was in the mind of Mr. Goldberg and Mr. Veeder five days after the stipulation was signed, was the question of what the United States might do with water after it reached the enclave, and whether the government's jurisdiction over the enclave prevented the exercise of state regulations within the enclave. It is clear that California law was to measure the rights to use of water claimed by the United States.

Extracts from that hearing are attached hereto as *Appendix B*.

(3) *Statements to the Congress before the execution of the Stipulation of November 29th, 1951.*

At the time the court made its ruling of February 11, 1958, interpreting the stipulation, the court did not take into account statements by Assistant Attorney General, A. Devitt Vanesh and William H. Veeder, before the House Judiciary Committee on June 25, 1951, [Cong. Record, July 9, 1951, pp. A–4371—A–4372]. Emphasis has been added.

"Mr. Vanesh: This particular complaint which has been filed is to determine what the United States acquired by purchase and not because it is the United States Government. As the Government, we are only asking to have determined what it purchased.

\* \* \* \* \* \*

"If there is not sufficient water there to take care of all the needs on that stream, that is something else. Of course, if the Federal Government needs more water than it purchased it would have to pay for it.

"The only thing this complaint and suit is designed for is to determine just what rights were secured when the Government purchased, the same as anyone here would do who made a purchase on that stream. * * *

"Mr. Veeder: We claim that the *measure of our rights are the rights to which we succeeded from Rancho Santa Margarita.*

"Mr. Walter: And nothing more; and without regard to the needs of the Marine Corps at Pendleton?"

"Mr. Veeder: That is correct sir.

"Mr. Fellows: Do you claim only that the state law applies?

"Mr. Veeder: Yes, sir. The *measure* of our rights, the *measure of the state law governs entirely our demand upon the Santa Margarita River.* In other words, we certainly cannot claim more than we acquired from the Rancho Santa Margarita.

"Mr. Fellows: And you claim no more?

"Mr. Veeder: That is correct."

Mr. Vanesh again testified before the Senate Judiciary Committee on September 22, 1951.

"Mr. Vanesh: About a year ago the Navy Department came to the Department of Justice and advised us that the water was being taken from the river and that they were being placed on a very dangerous position. They wanted to know what relief could be had.

"Now, we acquired what rights the Rancho Santa Margarita had, no more or less. * * *

"Mr. Vanesh: Mr. Veeder, when he testified before the court when he was handling the case in San Diego, made the statement in open court of record, that the Government would be very glad to stipulate so as to clarify what is meant by 'paramount rights,' and I have so told the State of California.

"*We are claiming under California law.* We have no sleeper in here that is trying to in any way change the water law of the West. This is just a suit on one little river, and that is all we are interested in. * * *

"Senator Nixon: What does the term 'Sovereignty' mean? In other words, what did it mean in the complaint? That is what we want to know.

"Mr. Vanesh: Senator, in this complaint it has nothing to do with having our rights adjudicated except as to what we are entitled to. We are only claiming what any other person would claim if you or I had purchased the same property. * * * ·

"When you buy a piece of property in California, under California law you are entitled to so much water. *What we want is what we bought and paid for, and that is all.* We want no more. * *

"Senator Watkins: May I pursue that just a little further, Mr. Chairman. The previous purchaser subjects himself to State law. Now are you going to accept the same limitation?

"Mr. Vanesh: We are governed by the State law, Senator. I mean that we make our claims under State law, the same as we are doing in this case here." * * *

(4) *Ruling on Motion to Reconsider*

■ The court granted the motion to take testimony concerning the surrounding circumstances and the intentions of the parties at the time the stipulation of November 29, 1951 was entered into.

The court now denies the motion to reconsider its rulings of February 11, 1958, as amended by its order of April 8, 1958 on the following grounds:

1. The stipulation is not ambiguous, and no recourse to matters of intention are necessary;

2. The stipulation is in line with the statements made to the Committees of the Congress by the Assistant Attorney General, and Mr. Veeder prior to the execution of the stipulation;

3. The stipulation is in line with the statements made by Mr. Veeder and Mr. Goldberg to open court on December 3, 1951, five days after the execution of the stipulation.

4. The stipulation is in line with the statements made to the Committees of the Congress of the United States by the Attorney General of the United States, after its execution.

5. The testimony of Mr. Goldberg standing alone and also as contrasted with his statements made on December 3, 1951, is entirely unsatisfactory, and affords no basis for reconsideration of the court's decision;

6. The government's motion and in fact the government's various contentions made from time to time since the case was assigned to the particular judge now handling it, have been a series of afterthoughts attempting to bolster the government's position, as one contention after another has been held invalid.

One portion of the Order of February 11, 1958, concerning the court's interpretation of the stipulation of November 29, 1951, gives concern.

In paragraph IV A, 2c of the Order of February 11, 1958, which appears on page 4 thereof, there was an interpretation of the word "use" and the following was stated by the court:

"Excluded, therefore, are claims by the United States of rights acquired by inverse condemnation, since the law by which such rights would be measured is federal law as set forth in decisions of federal courts involving inverse condemnation by the United States and not California law."

As discussed elsewhere in this memorandum under the subject of *Inverse Condemnation,* it is apparent that California law is in accord with federal law in recognizing inverse condemnation. Since the word "use" is a very broad word, and since inverse condemnation could arise under the word "use", the court is now of the opinion that if the United States should be able to claim rights by inverse condemnation under California law, they should be entitled to do so under the provisions of the stipulation. The quoted language will be stricken from the order of February 11, 1958.

The matter is utterly immaterial, since we hold elsewhere in this memorandum, that the United States, as the last downstream user was not legally able to effect a "taking" of upstream rights sufficient to constitute inverse condemnation under either state or federal law.

## VI

Mr. Veeder Had Authority to Enter into the Stipulation of Nov. 29, 1951 and the Government Is Bound by It.

As previously noted, Mr. Veeder's motion to reconsider raises the contention that he, as an attorney in the Department of Justice, had no power to bind the government, or as he puts it, to "stipulate away the sovereign status rights of the United States." It is a general rule that an estoppel will not run against the government, and also a general rule that the authority of United States Attorneys, attorneys in the Department of Justice and other governmental officials are limited and ordinarily they do not have authority to bind the government in financial matters or to dispose of government property.

A necessary exception to this general rule of limited authority, is a stipulation made by an attorney for the government in the course of handling an action. Law suits involving the government could not operate if government attorneys were not authorized to stipulate. They stipulate as to a waiver of jury, as to the testimony of witnesses, who cannot personally be called before the court, as to the facts in pretrial stipulations and as to the issues and contentions of the government for the purpose of pretrial.

Here, Mr. Veeder has not in any sense of the word, transferred, abandoned or given away any rights of the government, if it had any, in this particular situation. He has merely delineated the claim of the government in the nature of stipulating to the issue to be tried. He has further stipulated that state law shall control.

When a government lawyer prepares a complaint, he delineates the claim of the government. Whether or not

he may be permitted to later amend and widen that claim, is not a matter of right. (Rule 4(h) F.R.Civ.P., 28 U.S. C.A.), but depends on rules of law and court action.

 When a government lawyer participates in a pretrial hearing, he delineates or limits the claim of the government by his statements and by the pretrial stipulation executed and the order thereon. The government like any other litigant may only be relieved by a showing of "manifest injustice" (Rule 16, F.R.Civ.P.) and court determination.

There is no essential difference between what here occurred and the situations above. The government placed limits on its claim. It agreed California state law should measure its rights. The court has acted on the stipulation. The United States is bound thereby.

Title 5 U.S.C.A. § 310—"Conduct of legal proceedings" sets forth the authority of the Attorney General and officers of the Department of Justice to conduct legal proceedings. This authority must necessarily include litigation required to establish the rights of the government. Mr. Veeder is an attorney in the Department of Justice. The statements of the Attorney General and Assistant Attorney General of the United States referred to in this memorandum decision, clearly show Veeder's acts were *authorized and ratified*.

The following cases bolster our position, Tucker v. Alexander, 1927, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253; Judson v. United States, 2 Cir., 1903, 120 F. 637; Daitz Flying Corporation v. United States, D.C.N.Y.1945, 4 F.R.D. 372.

 Finally, we believe that the stipulation accords with the law in the matter (1) as to the rights claimed by the United States and (2) that state law controls. The stipulation recognized well-established law—that when the United States contracts or acquires property within a state, the law of that state controls what rights in the United

States arise therefrom (United States v. Burnison, 1950, 339 U.S. 87, 90, 70 S.Ct. 503, 94 L.Ed. 675; Reading Steel Casting Co. v. United States, 1925, 268 U.S. 186, 188, 45 S.Ct. 469, 69 L.Ed. 907; United States v. Fox, 1876, 94 U.S. 315, 320, 24 L.Ed. 192; United States v. Nebo Oil Co., 5 Cir., 1951, 190 F.2d 1003, 1010; United States v. Williams, 5 Cir., 1947, 164 F.2d 989, 993; Los Angeles & Salt Lake R. Co. v. United States, 9 Cir., 1944, 140 F.2d 436, 437, certiorari denied 1944, 322 U. S. 757, 64 S.Ct. 1264, 88 L.Ed. 1586; Werner v. United States, D.C.S.D.Cal. 1950, 10 F.R.D. 245, 247). All that Mr. Veeder has done is to stipulate in accordance with applicable law.

## VII

### Pretrial Rulings

There were heretofore submitted to counsel for their consideration and briefing, various propositions of law applicable to the trial of this action. The court heard argument, announced some tentative rulings, but made no formal rulings, since the pretrial stipulation of facts had not at that time, been executed and approved.

As to these questions of law presented upon pretrial with respect to which the parties seek an order in advance of trial, the court will rule upon the trial, in the absence of controlling precedents to the contrary, and subject to modification at the trial to prevent manifest injustice, as set forth hereafter; it being understood of course that none but the major parties to this action have participated in the briefing and arguments, and that the court is open to all litigants to contest the validity of these rulings.

### VII–A

Effect of the Circuit Court Decision in People of State of California v. United States, 9 Cir., 235 F.2d 647

The *holding* in that case is that it was error for the trial court to enter a separate judgment in the case as to less than all the defendants, and the case was remanded, with directions to hear the case

and to enter but one judgment adjudicating the right of all defendants to the water of the river. However, the language and reasoning of the decision is persuasive, and was intended for the guidance of the trial court, and in the absence of authority to the contrary, will generally be followed by the court in its rulings at the trial.

The Circuit decision was rendered in an appeal from a judgment below, in which the only parties were the United States, the State of California and the Santa Margarita Mutual Water Company. The decision is obviously not binding, or the law of the case, as to any of the parties except those participating in that appeal.

### VII–B

The Extent of the Rights of the United States of America as a Riparian Owner to Use Water Outside the Water Shed

The United States in its memorandum, states: "There is no claim made by the United States of America as a riparian owner to use water outside of the water shed" and "a claim to use riparian water upon non-riparian land would be contrary to the law respecting rights of that nature."

In view of the continually changing position of the government, we are in no doubt as to the extent of the government's disclaimer. The United States may contend (1) since it has rights to the use of water as a riparian owner, (2) that when those waters arrive within the enclave, (3) since the United States possesses exclusive jurisdiction over the enclave, and (4) since there are no users downstream from the United States, the United States may use the water which it was entitled to have flow into the enclave by reason of its riparian rights, anywhere within the enclave, and outside of the watershed.

We think such a position foreclosed by California law and we set forth the law of California on the issue of riparian rights.

Diversion of water to, and use on, non-riparian land constitute an appropriation of water and is not within the riparian right, Montecito Valley Water Co. v. City of Santa Barbara, 1907, 151 Cal. 377, 378, 90 P. 935; Duckworth v. Watsonville Water & Light Co., 1907, 150 Cal. 520, 526, 532, 89 P. 338; Bathgate v. Irvine, 1899, 126 Cal. 135, 141–144, 58 P. 442; Boehmer v. Big Rock Irrigation Dist., 1897, 117 Cal. 19, 26–27, 48 P. 908; Chauvet v. Hill, 1892, 93 Cal. 407, 410, 28 P. 1066; Gould v. Stafford, 1888, 77 Cal. 66, 68, 18 P. 879. Land outside the watershed of the stream from which the diversion is made is non-riparian land; Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 529, 81 P.2d 533; Anaheim Union Water Co. v. Fuller, 1907, 150 Cal. 327, 330, 88 P. 978, 11 L.R.A.,N.S., 1062.

The Circuit Court of Appeals so stated in its opinion on the appeal in this case;

"The government, as regards all claimants to water outside the enclave, is * * * in the position of a lower riparian which is compelled to make beneficial use within the water shed and for other than proper riparian uses must show an appropriation according to law." 235 F.2d at page 656.

### VII–C. D. and E.

### Riparian Uses

*The Extent of the Rights of the United States as a Riparian Owner to Use Water Within the Watershed*

The court posed the following issues of law:

"(c) The extent of the rights of the United States as a riparian owner to use water within the water shed;

"(d) Whether the use by the United States of water for military purposes is a beneficial use;

"(e) Whether the use by the United States of water for military purposes on its riparian land is a

proper riparian use." They will be considered together.

### (1) Basic Principles

The memorandum of the State of California contains an excellent summary which we adopt.

■ 1. The riparian proprietor does not own the water of a stream; he owns only a usufructuary right, which is the right in common with all the other riparians on the stream of reasonable use of water on his riparian land when he needs it (Prather v. Hoberg, 1944, 24 Cal.2d 549, 560, 150 P. 2d 405; Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 555, 81 P.2d 533; Anaheim Union Water Co. v. Fuller, 1907, 150 Cal. 327, 335, 88 P. 978, 11 L.R.A.,N.S., 1062.

■ 2. The riparian right extends to "all the water of the stream, and * * * that includes both surface and sub-surface flow, and likewise includes water in the underground basins" (Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 556, 81 P.2d 533, 561) but only as such water flows or is present naturally (Seneca Consol. Gold Mines Co. v. Great Western Power Co., 1930, 209 Cal. 206, 215, 287 P. 93, 70 A.L.R. 210).

■ 3. All rights to the use of water, including the riparian right, are limited to such water as is reasonably required for the beneficial use to be served; they do not extend to the waste, unreasonable use, or unreasonable method of diversion of water (West's Ann. Calif.Const. Art. XIV, sec. 3; Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 367–368, 40 P.2d 486.)

■ 4. Subject to the limitations of the preceding paragraph, the riparian right is prior and superior to rights based on appropriation, and a riparian owner is entitled to an injunction against an appropriator's interference with present riparian uses (Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 367–368, 40 P.2d 486; Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal. 2d 424, 445, 90 P.2d 537, 91 P.2d 105).

■ 5. The riparian right is not based on use and is not lost by non-use; however, to the extent that water is not presently being used by riparian proprietors under their riparian right it is subject to appropriation and beneficial use by others, the riparian owners being entitled to a declaration of their superior right to make reasonable beneficial use of the water in the future but not entitled to enjoin storage or use of water by an appropriator which does not conflict with their own present reasonable beneficial use (Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 445, 447, 458, 90 P.2d 537, 91 P.2d 105; Gin S. Chow v. City of Santa Barbara, 1933, 217 Cal. 673, 683–691, 22 P.2d 5.)

### (2) Military Use

The United States, the State of California and Fallbrook have briefed this issue and all agree that a military use is a beneficial use. Fallbrook states—

"There can be no doubt that the use of water for military purposes by the United States is a beneficial use." California states—

"The State of California does not contest that military use of water by the United States when made on riparian land owned by the United States may be a beneficial use within the riparian right."

■ The real question is the *reasonableness* of the use. This is a question of fact. Whether the military use is reasonable depends on the circumstances of the case. Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., 3 Cal. 2d 489, 45 P.2d 972. The court does not propose to rule on this issue until the trial of this case delineates through the evidence precisely what the military use consists of.

Certain principles of law will be pertinent to that decision.

■ Riparian rights may be exercised "for the purposes for which such

lands *are,* or may be *made adaptable* \* \* \* Nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under *reasonable methods of diversion and use,*" West's Ann. Constitution of State of California, Article XIV, Sec. 3 [Emphasis added].

Waste of water, unreasonable uses and unreasonable diversion are not protected. Peabody v. City of Vallejo, supra.

Taking a disproportionate share of the water to the detriment of other riparian owners would not be a reasonable use.

### VII–F

Is Artificial Storage of Water on the Surface or Underground for Future Use a Proper Exercise of the Riparian Right

The court posed the following issue of law. "The right of the United States to partially impound, regulate and spread its riparian water for the purpose of irrigating the vegetative cover and enriching the soil of the alluvial basin situate within Camp Pendleton and thereby in the process of irrigating the vegetative cover recharge the alluvial basin."

On reflection, the court regrets the form in which the issue was posed. It obviously combines the question of the right to irrigate and the right to store water.

### Irrigation

The right to use riparian water to irrigate lands riparian to the stream is clearly recognized. The question in this case will be whether the United States on a military reservation can claim this use.

The purpose and manner of the irrigation contemplated may be important. For example, spreading water in a wet period, under the guise of irrigation might well run afoul of the West's Ann. Cal.Constitutional Amendment, Art. XIV, Sec. 3. If through legitimate irrigation, water fed the underground basin, the result might well be the reverse.

These questions must await the trial and the determination of the facts.

### Storage of Water

The California memorandum succintly states the law. We paraphrase briefly from it.

One of the fundamental characteristics of the riparian right is that it is a right to use water as the water is *naturally* available. But the artificial storage of water for future use, whether cyclic or seasonal, is not a proper exercise of the riparian right, but instead constitutes an appropriation of water (Moore v. California Oregon Power Co., 1943, 22 Cal.2d 725, 731, 140 P.2d 798; City of Lodi v. East Bay Municipal Utility Dist., 1936, 7 Cal.2d 316, 335, 60 P.2d 439; Colorado Power Co. v. Pacific Gas & Electric Co., 1933, 218 Cal. 559, 564, 24 P.2d 495; Seneca Consol. Gold Mines Co. v. Great Western Power Co., 1930, 209 Cal. 206, 216, 287 P. 93, 70 A.L.R. 210; Herminghaus v. Southern California Edison Co., 1926, 200 Cal. 81, 109–111, 252 P. 607, which "may be exercised only pursuant to appropriations lawfully made", Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 450, 90 P.2d 537, 549, 91 P.2d 105.

Temporary impoundment of water for the purpose of providing a head for generation of power is permitted under the riparian right, Seneca Consol. Gold Mines Co. v. Great Western Power Co., 1930, 209 Cal. 206, 219, 287 P. 93, 70 A.L.R. 210.

### Recharging the Underground Basin —Intrusion of Salt Water

This problem also is in the case. It has not been briefed and must await the trial.

Judge Hall in Rank v. (Krug) United States, D.C.So.Cal.1956, 142 F.Supp. 1, at page 106, states in footnote 54,

"Neither the Constitutional amendment nor subsequent cases have changed the doctrine that the full natural or

826

ordinary flow of a river includes the seasonal and cyclic flood flows. See United States v. Gerlach Livestock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, and cases cited in footnote 50, page 99" (Should read page 96). In note 50, Judge Hall cites various cases and in particular the following decided after the Constitutional Amendment of 1928: —Collier v. Merced Irr. Dist., 1931, 213 Cal. 554, 558, 2 P.2d 790; Chowchilla Farms, Inc., v. Mortin, 1933, 219 Cal. 1, 33, 25 P.2d 435; Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., 1935, 3 Cal.2d 489, 569–570, 45 P.2d 972.

Is there a distinction between a natural and an artificial recharging of the basin? Suppose the underground flow was largely responsible for recharging the basin? Suppose the basin was being depleted by an unreasonable and excessive use by the United States? Suppose that only a reasonable use was being made of the water by the United States and still the basin was being depleted.

These questions must await the trial and briefing by Counsel.

### VII–G

The Claimed Prescriptive Rights of the United States. The Downstream User May Not Acquire Prescriptive Rights against the Upstream Owner.

Adverse use is, of course, one of the prerequisites to the establishment of a prescriptive right. As stated in City of San Diego v. Cuyamaca Water Co., 1930, 209 Cal. 105, 132, 287 P. 475, 488:

"The nature of the right claimed to have been acquired in the waters of a flowing stream by prescription rests *as a prime essential upon an adverse use thereof* by the claimant * * * which has, to the extent thereof and for the required term of years, *been acquiesced in by the person or persons otherwise entitled to the ownership* and enjoyment of the waters thus adversely

abstracted from such stream and to enforce those rights by appropriate action." [Emphasis supplied.]

In the absence of adverse use, the only kind of right that could be gained by use would be an appropriative right. We discuss in VII–H the problem of acquiring rights by appropriation.

An avalanche of California cases supports the proposition that, by its very nature, use of water by the lowermost user on a stream cannot possibly be adverse to anyone else.

"A right can be gained by prescription only by acts which operate as an invasion of the rights of the person against whom the right is sought and which afford a ground of action by such party against such claimant, and it is a rule of law so well settled by decisions in this and other states as to scarcely need any citation to support it *that a lower use, since it interferes in no way with the flow above constitutes no invasion of the upper riparian owner's right, and cannot, therefore, afford any basis for a prescriptive right,*" Pabst v. Finmand, 1922, 190 Cal. 124, 128, 211 P. 11, 12. In accord are the following decisions: Cory v. Smith, 1929, 206 Cal. 508, 511, 274 P. 969; San Joaquin & Kings River Canal & Irrigation Co. v. Worswick, 1922, 187 Cal. 674, 683–685, 203 P. 999; Holmes v. Nay, 1921, 186 Cal. 231, 234, 199 P. 325; Perry v. Calkins, 1911, 159 Cal. 175, 177–178, 113 P. 136; Hudson v. Dailey, 1909, 156 Cal. 617, 627, 105 P. 748; Walker v. Lillingston, 1902, 137 Cal. 401, 404, 70 P. 282; Cave v. Tyler, 1901, 133 Cal. 566, 567–568, 65 P. 1089; Bathgate v. Irvine, 1899, 126 Cal. 135, 140–141, 58 P. 442; Hargrave v. Cook, 1895, 108 Cal. 72, 77–79, 41 P. 18, 30 L.R.A. 390.

The cases cited above are all directly in point because they involved the diversion of water downstream from the owner of the prior right against which the prescriptive claim was asserted. Likewise, Camp Pendleton, where the

diversions or extractions of water assertedly have been made, is downstream from any other claimant to the water.

The United States relies upon three cases. They are not in point. In Hudson v. West, 1957, 47 Cal.2d 823, 306 P.2d 807, plaintiffs claimed as riparian owners and failed to support their claim. Our problem is not discussed. Larsen v. Apollonio, 1936, 5 Cal.2d 440, 55 P.2d 196, upheld a prescriptive right. The statement of facts, in the opinion, described the plaintiff's diversion as *downstream* from defendant's land. The only case cited in Larsen in support of the prescriptive claim was Smith v. Gaylord, 179 Cal. 106, 108–109, 175 P. 449. There the prescriptive claim was held good because the claimant had trespassed on the land of the owner of the prior right and made his diversion there. The State of California has submitted excerpts from the record in Larsen v. Apollonio before the Supreme Court, and these excerpts show that the situation in that case was identical to the situation in the Smith v. Gaylord, supra. That is, the actual diversion was instituted, and during the entire prescriptive period was carried on from a diversion point on part of a larger tract held in one ownership, which included the upstream land against which the Larsen case held the prescriptive right had accrued. After the end of the prescriptive period, but before the Larsen suit was instituted, the upstream portion of the tract was conveyed to the defendant. Obviously the conveyance could not cut off the prescriptive right which had arisen by the trespass over the land.

Dykzeul v. Mansur, 1944, 65 Cal.App. 2d 503, 150 P.2d 958 is the third case. Here the defendant user prevailed. The diversion point was on plaintiff's upstream land and the ditch ran through plaintiff's land. Accordingly the adverse user of plaintiff's land for the purpose of the diversion, resulted in the prescriptive right to a downstream user.

■ We conclude that the law in California is clear that a downstream user may not *ipso facto* acquire prescriptive rights against an upstream owner of water rights except in those instances where the downstream user has acquired rights over the other parties' land for the purpose of the diversion.

The United States claims a variety of prescriptive rights.

"(1) As successor to the Rancho Santa Margarita;

"(2) Resulting from its uses after 1942;

"(3) Resulting from a combination of uses by its predecessor before 1942 and the United States thereafter;

"(4) Prescriptive rights claimed by the United States outside the Santa Margarita River watershed;

"(5) Prescriptive rights to the use of water claimed by the United States in connection with Lake O'Neill."

Actually these claims break themselves naturally into two categories,

(A) Prescriptive rights claimed to have been acquired by the Rancho and therefore passing to the United States on its acquisition of the Rancho, and

(B) Prescriptive rights claimed to have been acquired by the United States since 1942.

■ As to both classes of claims, since prescription does not run upstream, it is obvious that neither the Rancho Santa Margarita nor the United States could acquire prescriptive rights against upstream owners.

The Rancho, the last downstream user, never acquired prescriptive rights by uses on the Rancho, and thus had neither vested prescriptive rights to convey to the United States nor incipient prescriptive rights to which the United States could tack uses of its own. The uses of United States itself, as the lowermost user since 1942, similarly lacked the quality of hostility or adversity necessary to create a prescriptive right. And this is true whether what is asserted is the right to store water in Lake

O'Neill for later use within the watershed or the right to make direct diversions or extractions for use outside the watershed of the Santa Margarita River. These rights could not arise by prescription.

■■■ As to the rights claimed to have been acquired by the United States itself since 1942, a second reason, renders it impossible for the United States to have acquired prescriptive rights. Since the United States is immune from suit except by consent and since it had exclusive jurisdiction within the enclave, there was no means by which a person *adversely affected by the government user downstream* (assuming such impossible situation), could have taken any action by self help or through court suit, against the United States to prevent such adverse use.

The Circuit in the prior appeal concluded that, irrespective of the ability of a lowermost user, other than the United States to acquire prescriptive rights, the United States could not acquire such rights, because of its ·sovereignty over the military enclave. The Circuit Court reasoned that the same element of adversity, which the California cases point out is lacking in downstream use generally, is lacking when the United States uses water which has found its way onto the military enclave:

"The doctrine of prescription envisions a party, whose rights are being openly and notoriously violated by another, and who has the power to intervene and prevent the violation from becoming an adverse property right by self-help or by bringing an action or obtaining an injunction before the period of prescription runs. But, when the United States was in possession as sovereign, the water which came into the enclave could be used without let or hindrance in any way which the agents of the government chose" (235 F.2d at page 661).

The United States, for this additional reason, could not have acquired any prescriptive rights to store water or use water outside the watershed by its own uses within the Camp Pendleton military enclave since 1942.

VII–H

Appropriative Rights. Must the United States Comply with State Procedures for the Acquisition of Appropriative Rights?

The court posed this issue:—The extent of the appropriative rights claimed by the United States in connection with Lake O'Neill, Stuart Mesa, South Coast Mesa, "and all other uses for which appropriative claims are asserted by it; must the United States comply with State procedures for the acquisition of appropriative rights."

■■■ We do not here consider or pass upon the validity of alleged appropriations of water, made by the Santa Margarita Rancho prior to December 19, 1914, the date of the Water Commission Act, West's Ann.Cal.Water Code, § 100 et seq. If the Rancho owned such rights they passed to the United States. The discussion and rulings which follow are limited to matters arising after December 19, 1914.

1.

The Contentions of the United States

The government's contentions in this case have been fascinating. They have shifted from hearing to hearing, dependent only upon the imagination and ingenuity of William H. Veeder, representing the United States. With reference to *unappropriated water* they presently seem to be as follows:

(1) *The Self Help Theory*

That by merely diverting the water and putting it to beneficial use outside the watershed of the Santa Margarita River, the United States has acquired valid appropriative rights under California law, on the theory that diversion and application of water to a beneficial use coupled with the intent to appropriate are sufficient under California law to create an appropriative right in any water user even if he has failed to com-

ply with the application and permit procedures required by state statutes.

#### (2) *State Police Regulation Theory*

That California's statutory application and permit procedures for the acquisition of an appropriative water right are police regulations which are inapplicable to the United States, with the result that, even if all other water users must comply with such procedures in order to acquire a valid appropriative right, the United States can obtain the right merely by taking and using the water.

#### (3) *Government Ownership of Water Theory*
#### *Incorporeal Hereditament*

That even before it first diverted and used the water on Camp Pendleton, the United States possessed the right to do so, by virtue of its ownership of the public domain; hence, when it began diverting and using the water the United States merely exercised a right already residing in it.

#### (4) *Reserved Land Theory*

That the United States, in connection with reserved lands, may use all the unappropriated water it needs; that this right in some manner arises as soon as a reservation (here Camp Pendleton) was created.

#### (5) *Priority in Time of Filing Theory*

That priority in time of filing applications for unappropriated water by the United States creates a right in the United States; and that Fallbrook's applications have been so changed and amended that they are now junior to that of the United States; and that this court should determine priorities accordingly.

#### (6) *Direct and Inverse Condemnation Theory*

That the United States acquired rights to use the water (within and outside the watershed) through the exercise of the power of eminent domain either (a) by its direct condemnation of the Rancho Santa Margarita or (b) by subsequent inverse condemnation assertedly resulting from its use of the water outside the watershed.

#### (7) *Bucket at the End of Stream Theory Water from Public Lands Upstream*

On October 21, 1957, the government advanced a new contention, namely that at the time the United States, in 1942, began diverting water from the river for use in Camp Pendleton and outside the watershed, the United States was exercising its rights which it already owned; that since the Treaty of Guadalupe Hidalgo, West's Ann.Cal.Const. Vol. 3, p. 727 et seq., the United States had been the owner of the public lands now held as public domain, National Forests, and Indian Reservations, and hence the United States was the owner of all rights to the unappropriated waters arising from said lands; that the United States might require these waters to flow to the enclave, and there take and use the water. Hence the title given this theory by the court—"Bucket at the end of the stream."

Obviously, the contention flies in the face of the stipulation of November 29, 1951, that the government claims only the rights it acquired when it purchased Santa Margarita Rancho and such rights as it thereafter *"gained"* by "prescription or use or both."

That the United States has rights pertaining to the National Forests, the Public Domain Lands and the Indian Reservations, as set forth in the amended complaint, we have no doubt. But these rights are rights limited to the lands in question and to express the matter in the vernacular sense, the United States has no right to catch in a bucket at Camp Pendleton, water which it claims a right to in connection with the lands upstream above mentioned.

The United States has since disclaimed any right to augment its water rights at Camp Pendleton by virtue of the three types of public lands upstream, and this concession by the government was incorporated by the court into its order of April 8, 1958, referred to above, wherein

it is stated, "The United States disclaims any right to augment its rights to the use of water claimed by it in connection with Camp Pendleton, the United States Navy Ammunition Depot, and the United States Naval Hospital by reason of its rights to use of water claimed in connection with its other land in the watershed and the Santa Margarita River."

Certain of the remaining theories and contentions are within, and certain are without, the terms of the stipulation of November 29, 1951. Within the terms of the stipulations are (1) The self help theory, if California law permits self-help since 1914. (5) Priority in time of filing theory, if state law so provides; (discussed in Section VIII of this memorandum). (6) Direct and Inverse condemnation theories. (discussed in Sec. VII–J of this memorandum)

But clearly, (2) State Police Regulation theory, (3) government ownership of water theory and (4) Reserved land theory, are outside the terms of the stipulation of November 29, 1951. *There the government clearly stated it was claiming no rights by reason of its sovereignty as such,* but only those rights it acquired in the acquisition of the Rancho and those it had gained thereafter by prescription or use or both.

### 2.

The Self-Help Theory. The United States Must Comply with State Law

#### (1) *State Law and Procedure*

Prior to December 19, 1914, "To constitute a valid appropriation of water, * * * three elements must always exist: (1) an intent to apply it to some existing or contemplated beneficial use: (2) an actual diversion from the natural channel by some mode sufficient for the purpose; and (3) an application of the water within a reasonable time to some beneficial use. Intention to appropriate can be measured only by all the circumstances in the case." 26 Cal.Jur., Waters, Sec. 253; See also 56 Am.Jur., Waters, Sec. 296.

The government claims that this is still California law, and that all necessary elements to constitute an appropriative right came into existence by its self help in the early 1940's, prior to the time Fallbrook ever filed an application with the Division of Water Resources, the predecessor of the State Water Rights Board. The government claims that it will show,

(1) intention to appropriate water for a beneficial use

(2) actual and open appropriation and diversion, and

(3) that the water has been put to a beneficial use

Prior to December 19, 1914, the effective date of the Water Commission Act (Stat.1913, c. 586) such method for appropriating water existed under California law and could result in a vested appropriative right. In 1913 the State of California, by this statute, provided for a statutory procedure to be followed in the appropriation of unappropriated water.

If this procedure was not the exclusive method of appropriating water after 1914, it became so in 1923 when this method of appropriation was made *exclusive* by amendment to the Water Commission Act (Stat.1923, c. 87). Appropriation by pre-emption or self help was thus terminated at least by 1923.

The present section of the West's Ann. California Water Code, having its genesis in these statutes is Sec. 1225.

"§ 1225. *Compliance with division provisions.* No right to appropriate or use water subject to appropriation shall be initiated or acquired except upon compliance with the provisions of this division."

The statutory machinery for this procedure has changed through the years since 1914, from applications to the State Water Commission, later a Division of Water Resources in the Dept. of Public Works, until in 1956, these functions were assigned to a State Water Rights Board.

The procedure was generally the same.

An application to appropriate unappropriated water would be filed with the Water Commission or the Division of Water Resources of the State of California, (since 1956 the State Water Board) and this body, after hearings, could grant permission and permit for the appropriation of the water. Later the permits ripened into licenses.

In 1956, the California Legislature (Stat.1956—Budget Session, c. 52) abolished the Division of Water Resources and the office of the Chief Engineer, but their functions were preserved and divided between a newly created Department of Water Resources (West's Ann. Calif. Water Code, §§ 120–163) and an independent three-member Board, the States Water Rights Board (West's Ann. Calif. Water Code, §§ 175–188). The major function of the new Board is the administration of the statutory law relating to the appropriation of unappropriated or unused water of the state.

Vested rights were unaffected. All permits and licenses issued by the statutory agency (now the State Water Board) are declared therein to be "subject to vested rights," (Cal. State Water Board, "Rules, Regulations and Information pertaining to Appropriation of Water in California" (1956) ; see, Meridian, Ltd. v. City and County of San Francisco, 13 Cal.2d 424, 450, 90 P.2d 537, 91 P.2d 105; Rank v. Krug, D.C., 142 F. Supp. 1).

(2) *Compliance with Statutory Procedures to appropriate water, is required by State law.*

Crane v. Stevinson, 1936, 5 Cal. 2d 387, 54 P.2d 1100, holds compliance with the statutory procedure is required. Hudson v. West, 1957, 47 Cal.2d 823, 306 P.2d 807, relied on by the United States, is not contra. It concerned prescriptive and not appropriative rights. The court refused to pass on the necessity of compliance with statutory requirements, since the Department of Public Works was not a party.

The courts of other western states, with similar statutes, have reached a like result requiring compliance with the state statutory procedure.

Arizona — In re Determination of Relative Rights, 1935, 45 Ariz. 156, 41 P.2d 228, 235–236;

Montana — Anaconda National Bank v. Johnson, 1926, 75 Mont. 401, 244 P. 141, 144;

Utah — Deseret Live Stock Co. v. Hooppiania, 1925, 66 Utah 25, 239 P. 479; Bullock v. Tracy, 1956, 4 Utah 2d 370, 294 P.2d 707, 709;

Wyoming — Wyoming Hereford Ranch v. Hammond Packing Co., 1925, 33 Wyo. 14, 236 P. 764, 768–771; Laramie Rivers Co. v. LeVasseur, 1949, 65 Wyo. 414, 202 P.2d 680, 686;

New Mexico–State ex rel. Bliss v. Dority, 1950, 55 N.M. 12, 225 P.2d 1007, 1011, appeal to United States Supreme Court dismissed 341 U.S. 924, 71 S.Ct. 798, 95 L.Ed. 1356.

The stipulation of November 29, 1951, requires the rights of the United States to be measured by State law. There is no body of federal water law. The California Supreme Court has stated that the unappropriated waters in the streams of California constitute "the public waters of the state to be used, regulated and controlled by the state or under its direction" (Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 445, 90 P.2d 537, 547, 91 P.2d 105. West's Ann. California Water Code, §§ 102, 1201; See West's Ann. California Government Code, §§ 180–182).

In view of the stipulation of November 29, 1951 and the matters hereinafter discussed, the United States must comply with State law in seeking to appropriate water. This disposes of the "Self Help Theory".

### 3.

### The United States Sovereignty Theories to Right to Water

The three theories outlined above, (2) State Police Regulation Theory, (3) Government ownership of water theory and (4) Reserved land theory, will be considered together.

#### (1) *The Stipulation Forecloses Their Application*

All such issues are outside the terms of the stipulation of November 29, 1951 and hence we hold the government can legally assert no rights to use of water under any of them. All are essentially based on government sovereignty. None rest on California law and all are in contravention of California law. The stipulation forecloses claims so based.

#### (2) *Apart from the stipulation the theories and claims have no validity*

These claims raise the basic questions in this case. Does the State have the power to deal with applications to appropriate water? Does State law and procedure apply? Must the United States, like any private party, comply with State law and procedure? There is thus presented a much discussed problem—does State law control the appropriation of the use of unappropriated water in the Western states?

#### Government Ownership Theory
#### Police Regulation Theory

The Government's *ownership theory* is in summary as follows:—

(1) A water right is an *incorporeal hereditament;*

(2) As the owner of the public domain the Government possessed the power to dispose of land and water thereon, together, or to dispose of them separately;

(3) That Congress intended by the Acts of 1866, 1870, and the Desert Land Act of 1877, to establish the rule that for the future the land should be patented separately from the water;

(4) That, therefore, appropriative rights to water could be acquired from the United States, by compliance with State law to effectuate the passage of title from the National Government;

(5) That under California law, (The California doctrine), appropriative rights have always been claimed to be deraigned by private persons under the Act of Congress or from the acquiescence of the Federal Government.

(6) Therefore the Government *owns* the unappropriated water and may take it as and when it chooses, without regard to State law.

We have labeled this—Mr. Veeder's *"metaphysical theory"* since he has the water metaphysically separated from the land on the public domain since at least 1877.

If this were true, *no riparian rights could ever have attached to land acquired by patent from the public domain.* We know this is not true, because although the Desert Land Act of 1877 and related acts, permitted and recognized appropriative rights when good under local law and custom, the Supreme Court decisions declare that States could set up such systems of handling water rights as they might desire. In fact California and most of the Western States set up dual systems, whereby both appropriative rights and riparian rights were recognized. California thus permitted the patentee of government land to assert riparian rights, limited to the extent that vested rights had been secured by prior appropriation.

We think the correct view is that as appropriative rights were obtained pursuant to local law and custom, there was a pro tanto severance of land and water to the extent of these rights. Thus these appropriative rights were obtained from the United States.

With the land, as it was patented, went the remaining water rights and thus the Western States recognized this land as having riparian rights, diminished to the extent that valid appropriative rights had been secured.

If Mr. Veeder's "metaphysical theory" holds water, so to speak, then no riparian rights exist in California, since the water

rights were severed in 1877 and, therefore, on a patent to *land* from the public domain, no water rights passed to the patentee.

What mischief and havoc such a theory could wreak in the western states, need not be spelled out,—it need only be suggested.

The *Police Regulation theory*, viz. that State police regulations—laws relating to appropriation of water—can have no effect under the United States Constitution, on the rights of the United States to take unappropriated water, is but an extension of the Government Ownership theory.

If the Government owns the unappropriated water the principle is sound; if the Government does not own the water, the theory has no application.

Thus we pass the Police Regulation theory as adding nothing to the Government Ownership theory.

### Reserved Land Theory

The government contends that the Santa Margarita Rancho on its acquisition by the United States, became a reservation—reserved land of the government. That under the Property clause of the Constitution (Art. IV. Sec. 3), the government can do as it pleases with unappropriated water in the streams *on* the reservation.

With the basic contention we have no quarrel. Within the enclave or reservation, the government can do as it pleases with the unappropriated water, so long as vested rights of other parties are not injured. Since there are no property rights downstream from the enclave, it is difficult to see how anyone can be hurt by the use by the government of such water as reaches the enclave. But the extensions of the contention give concern. The government claims the right to reach upstream and insist that certain waters, in addition to waters which it claims by riparian right, by prescription and by appropriation prior to 1914, flow into the reservation.

Analyzing this contention, it is apparent the government claims more than the right to *use* such water as it finds *on* or such as *flows* to the reservation. To the extent that the United States claims an *appropriative* right we have disposed of it above. The word is one of art in water law. We have discussed self help and state procedure.

Under the sovereignty theories, although the United States talks of appropriation, it is misusing the term. The United States is talking of alleged rights they already claim to own.

The problem brings into focus the conflict between rights under federal law asserted by the government on its reservation and rights under state law asserted by upstream users—or generally the problem of Federal and State rights. True, the government disclaims it seeks the right to use any water to which there are vested rights, either riparian, prescriptive, appropriative or otherwise.

The government simply is saying: There is unappropriated water in the River on the Government reservation. The government may use it, take it, and prevent other upstream users from interfering with the flow and assert valid rights against all prospective upstream users, all of whom would concededly have to comply with state law and procedure to make a valid appropriation.

The government's position as to reserved lands is most succinctly and forceably set forth in *an Indian Land case,* United States v. Walker River Irr. Dist., 9 Cir., 1939, 104 F.2d 334. There the Walker Indian reservation was on the lower 30 miles of the river, and the defendants upstream constructed dams and reservoirs interfering with the flow of the river. The question the court stated, was "whether the waters of the stream were intended to be reserved for the use of the Indians, or whether the lands only were reserved," (page 336):

" * * * (b) The power of the Government to reserve the waters and thus exempt them from subsequent appropriation by others is beyond debate. Winters v. United States, supra, 207 U.S. [564, at] page 577, 28 S.Ct. 207, 52 L.Ed.

340. *The question is merely whether in this instance the power was exercised.* If it was, the appellees are in no position to claim paramount rights in the stream, since their appropriations were all later than 1859.

"It is of course well settled that private rights in the waters of non-navigable streams on the public domain are measured by local customs, laws and judicial decisions. California-Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed 1356. The act of July 26, 1866, 14 Stat. 251, 253, was no more than a formal confirmation of local law and usage which had theretofore met with silent acquiescence on the part of the national government. Broder v. Natoma Water Co., 101 U.S. 274, 276, 25 L.Ed. 790; California-Oregon Power Co. v. Beaver Portland Cement Co., supra, 295 U.S. at pages 154, 155, 55 S.Ct. 725, 79 L.Ed 1356. *But it does not follow that the Government may not, independently of the formalities of an actual appropriation, reserve the waters of non-navigable streams on the public domain if needed for governmental purposes.*

"In United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, it was said that although this power of changing the common law rule as to streams within its borders undoubtedly belongs to each state, yet two limitations must be recognized: first, that, in the absence of specific authority from Congress, a state cannot destroy the right of the United States, as the owner of lands bordering on a stream, *to the continued flow of its waters, so far, at least, as may be necessary for the beneficial uses of the government property;* second, that it is limited by the superior power of the general government to secure the uninterrupted navigability of all navigable streams within the limits of the United States * * *" (Emphasis added.)

Although the government relies basically for its "sovereignty theories" on the three categories of cases, (1) the power and reclamation cases, (2) the navigation cases, and (3) the Indian reservation cases, only two reported cases have been cited or can be found, where it is argued by the United States that the government by the creation of a *Military reservation,* has been accorded rights claimed herein and analogous to the rights arising in the three situations above.

We discuss the two cases on which the United States relies to justify its contentions in this case.

Nevada Ditch Co. v. Bennett, 1896, 30 Or. 59, 45 P. 472, 484–485 concerned in part a transfer of an old military post to private ownership and whether rights to the use of water, exercised by the United States thereon, passed to the patentee, to the detriment of a prior appropriator. The court held alternately that (1) when the reserve was thrown open to and restored to the public domain, the United States use of water was no longer appurtenant to the land and was in fact "abandoned," and (2) that the patent to the patentee was expressly "subject to any vested and accrued water rights * * * recognized * * * by the local customs, laws, and decisions of courts"; that this was "an implied recognition of such rights of prior appropriators * * * and a direct transfer expressly subject to such rights" (45 P. at page 485).

There is language from which the United States draws solace,—"the waters of unnavigable streams are part of such public domain, and hence the property of the government, which may lay hold of and use them, without taking any of the steps made necessary to obtain a usufructuary interest therein by private individuals." Then appears the following, *"But, if it would prevent individuals from acquiring interests by prior appropriation, it would seem that there should be a reservation made of such water, either by act of congress, or some executive order"* (45 P. at page 485). (Emphasis added.)

Story v. Woolverton, 1904, 31 Mont. 346, 78 P. 589, 590 is almost a Chinese copy of Nevada Ditch Co., supra. The

United States had created a reservation and used water. Later it abandoned the reservation and granted the land to the State of Montana. The State claimed a ditch used previously to convey water to the reservation and water rights in connection therewith. The Court held that when the United States owned the reservation and water running in the various nearby streams it was unnecessary for the United States to "appropriate" the water but only to "take it and use it;" that when the United States abandoned the reservation, it abandoned the use of the water which was thereafter subject to appropriation. Alternatively the Court held that the grant to Montana did not expressly name water rights and that they did not pass to Montana by the grant.

The cases are of only historical interest. In each case it appeared that *in the past* the United States had used water running on a reservation or on public domain land nearby. No controversy existed or was decided as to such matters. Nor in either case did the United States reach upstream and contend that the flow of a stream not *then* running through public domain, flow onto the reservations. The cases did not consider our problem and are not determinative of the issue.

We do not believe that the analogy to the three types of cases referred to above can be carried over to a Military reservation of the character of Camp Pendleton.

Each of such class of cases stand on its own set of facts and the reason for the rule prohibiting state interference logically follows.

### THE POWER CASES

As to waters within the scope of the Federal Power Act, 16 U.S.C.A. § 791a et seq., the Supreme Court has decided cases which clearly limit or negate the power of states to interfere with the federal project. These cases concern both navigable and non-navigable streams.

In Federal Power Commission v. State of Oregon, 1955, 349 U.S. 435, 75 S.Ct.

832, 99 L.Ed. 1215 (the Pelton Dam case), the holding was generally that the Federal Power Commission had the power and right to issue a license to a private hydro-electric project even though the State of Oregon objected that, (1) the project would interfere with fish and state regulations concerning them and (2) that the Acts of July 26, 1866, July 9, 1870, and the Desert Land Act of 1877, constitute an express congressional delegation or conveyance to the state of the power to regulate the use of the waters.

One end of the dam abutted on Indian lands, reserved as such by the government since 1910 and 1913; and the other abutted on land reserved to the United States for power purposes since 1909. The court, though not deciding any question of interference with vested rights, says "The Commission stated that the project will be subject to all existing rights to the use of the waters of the river, whether perfected or not," (349 U.S. at page 440, 75 S.Ct. at page 836). The federal Power Act, 41 Stat. 1077 (1920) (16 U.S.C.A. § 821), in Sec. 27 provided for protection of vested rights.

The court disposes of Oregon contentions based on the Desert Land Act of 1877 and related acts by holding that they pertain to public land—land open to appropriation and disposal according to law, and not to reserved land of the United States.

The court said at page 441 of 349 U.S. at page 836 of 75 S.Ct.: "I. *Applicability of the Federal Power Act.* On its face, the Federal Power Act applies to this license as specifically as it did to the license in the First Iowa case [First Iowa Hydro-Electric Cooperative v. Federal Power Commission, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143]. There the jurisdiction of the Commission turned almost entirely upon the navigability of the waters of the United States to which the license applied. Here the jurisdiction (of the F. P. C.) turns upon the ownership or control by the United States of the reserved lands on which the licensed project is to be located. The

authority to issue licenses in relation to navigable waters of the United States springs from the Commerce Clause of the Constitution. The authority to do so in relation to public lands and reservations of the United States springs from the Property Clause—'The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States * * *.' Art. IV, § 3 * * *"

State of Washington Dept. of Game v. F. P. C., 9 Cir., 1953, 207 F.2d 391, certiorari denied 347 U.S. 936, 74 S.Ct. 626, 98 L.Ed. 1087, upheld the authority of the F. P. C. to license the City of Tacoma for a power project on the Cowlitz River, including two dams, one of which would inundate and destroy a state fish hatchery.

In City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 78 S.Ct. 1209, 1217, 2 L.Ed.2d 1345 (further litigation growing out of the Cowlitz River project, considered in State of Washington Dept. of Game v. F. P. C., supra, the Supreme Court held the issues foreclosed by that decision and the denial of certiorari therein and expressly held that the City of Tacoma as licensee under the Federal Power Commission had authority to in substance take by inundation the fish hatchery of the State of Washington to be flooded by one of the dams, but upon payment of just compensation. The lack of state statutory authority to the City of Tacoma to condemn or exercise such power was not controlling.

The Supreme Court said,

" * * * We come now to the core of the controversy between the parties, namely, whether the license issued by the Commission under the Federal Power Act to the City of Tacoma gave it capacity to act under that federal license in constructing the project and delegated to it federal eminent domain power to take, upon the payment of just compensation, the State's fish hatchery—essential to the construction of the project—in the absence of state legislation specifically conferring such authority. * * *

"It is no longer open to question that the Federal Government under the Commerce Clause of the Constitution (Art. 1, § 8, cl. 3) has dominion, to the exclusion of the States, over navigable waters of the United States. Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23; State of New Jersey v. Sargent, 269 U.S. 328, 337, 46 S.Ct. 122, 124, 70 L.Ed. 289; United States v. Appalachian Electric Power Co., 311 U.S. 377, 424, 61 S.Ct. 291, 307, 85 L.Ed. 243; First Iowa Hydro-Electric Cooperative v. Federal Power Commission, 328 U.S. 152, 173, 66 S. Ct. 906, 916, 90 L.Ed. 1143; United States v. Twin City Power Co., 350 U.S. 222, 224–225, 76 S.Ct. 259, 260–261, 100 L.Ed. 240. *Congress has elected to exercise this power under the detailed and comprehensive plan for development of the Nation's water resources, which it prescribed in the Federal Power Act,* to be administered by the Federal Power Commission. First Iowa Hydro-Electric Cooperative v. Federal Power Commission, supra; United States v. Appalachian Electric Power Co., supra," (Emphasis supplied.)

It is our conclusion that as to the use of water for power projects, the Supreme Court has made it clear that Congress has acted to endow the projects with such a public interest that state action shall not be permitted to interfere with the functioning of the projects.

## RECLAMATION PROJECT CASES

The recent decision in the Supreme Court, Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313, makes it clear that in situations where reclamation projects are involved, even though the power element is absent, the same rule will be applied by the Supreme Court that the Federal government will not brook in-

terference by the states. The Reclamation Act of 1902, in Sec. 5 [43 U.S.C.A. § 431] provided for a 160 acre limitation on the use of water from the reclamation district. Sec. 8 of the same act, [43 U.S. C.A. § 383] provided that nothing in the Act should be construed "to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder," and instructed the Secretary to proceed in conformity with such laws. The Supreme Court of California (Ivanhoe Irrigation Dist. v. All Parties and Persons, 47 Cal.2d 597, 306 P.2d 824), invalidated contracts with the 160 acre limitation. The United States Supreme Court said, as to the rights and duties of the United States under the contracts, these are matters of Federal law on which this court has final word, Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; and "from the beginning of the federal reclamation program in 1902, the [national] policy as declared by the Congress has been one requiring that the benefits therefrom be made available to the largest number of people, consistent, of course, with the public good," and "In developing these projects the United States is expending federal funds and acquiring federal property for a valid public and national purpose, the promotion of agriculture. This power flows not only from the General Welfare Clause of Art. I, § 8, of the Constitution, but also from Art. IV, § 3, relating to the management and disposal of federal property. As this Court said in United States v. City and County of San Francisco, 1940, 310 U.S. 16, 29–30, 60 S.Ct. 749, 84 L.Ed. 1050, this *'power over the public land thus entrusted to Congress is without limitations. "And it is not for the courts to say how that trust shall be administered. That is for Congress to determine."'* See also United States v. State of California, 1947, 332 U.S. 19, 27, 67 S.Ct. 1658, 1662, 91 L.Ed. 1889, and State of Alabama v. State of Texas,

1954, 347 U.S. 272, 273–274, 74 S.Ct. 481, 482, 98 L.Ed. 689." (Emphasis added.)

We conclude that the public interest in the Reclamation projects has been settled as conclusively as those in the power projects; and that again this situation results from Acts of the Congress of the United States.

### THE NAVIGATION CASES

■ The power of the government under the Commerce clause to prevent state action affecting water, where a navigable river is involved is another instance in which the federal government will brook no state interference. United States v. Rio Grande Dam & Irrigation Co., 1898, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136; Gutierres v. Albuquerque Land & Irrigation Co., 1903, 188 U.S. 545, 23 S.Ct. 338, 47 L.Ed. 588.

In First Iowa Hydro-Electric Cooperative v. F. P. C., 1946, 328 U.S. 152, 66 S.Ct. 906, 914, 90 L.Ed 1143, Sec. 9(b) of the Federal Power Act, 41 Stat. 1068 (16 U.S.C.A. § 802) provided that each applicant should submit satisfactory evidence "that the applicant has complied with the requirements of the law of the State or States within which the proposed project is to be located with respect to * * * appropriation, diversion and use of water for power purposes * * * " The project divested nearly all the water of Cedar creek, a navigable river about 20 miles above the entry of that river into the Mississippi. This was expressly forbidden by Iowa law.

The Supreme Court held in substance that the state of Iowa should have no veto power in connection with the federal project. The case rests both on the right of the United States to control navigable waters (328 U.S. at page 173, 66 S.Ct. at page 916) and upon the comprehensive scope of the Federal Water Power Act (328 U.S. at pages 180–181, 66 S.Ct. at pages 919–920) and "The detailed provisions of the Act providing for a federal plan of regulation", leaving "No room or need for conflicting state con-

trols" (328 U.S. at page 181, 66 S.Ct. at page 920).

The navigation cases are clearly distinguishable and have no real application to the question at hand, but illustrate how power to resist state inference has come from Acts of the Congress of the United States.

## THE INDIAN CASES

Winters v. United States, 1908, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340, holds that where reservations have been created for Indians and lands reserved for such purposes, there has been impliedly reserved also, by the treaty or executive order, the right to the use of all water reasonably necessary for the needs of the Indians. The case must be read with the 9th Circuit opinion below, 1906, 143 F. 740, 148 F. 684.

Conrad Inv. Co. v. United States, 9 Cir., 161 F. 829, termed the Indians' right to water "a paramount right" and the decree provided for modification to provide for future needs.

United States v. Ahtanum Irrigation Dist., 9 Cir., 1956, 236 F.2d 321 is a recent affirmation of the Winters doctrine. Relying on the Winters and Conrad cases, the court states that "the paramount right of the Indians * * * extended to the ultimate needs of the Indians as those needs and requirements should grow to keep pace with the development of Indian agriculture upon the reservation" (at page 327). The case states that the rights of appropriators exist only in the water remaining after the needs of the Indians have been satisfied. At page 327.

"It is too clear to require exposition that the state water right decree could have no effect upon the rights of the United States. *Rights reserved by treaties such as this are not subject to appropriation under state law.* Nor has the state power to dispose of them. Federal Power Commission v. State of Oregon, 349 U.S. 435, 444, 75 S.Ct. 832, 99 L.Ed. 1215". At page 328. (Emphasis added.)

The Indian cases cited heretofore rest fundamentally on the background of the dealings between the United States and the Indians and the treaties and the Acts of Congress. Throughout the cases there runs the theme that the Indians have not been fairly treated; that at one time they occupied such parts of the country as they desired and exercised rights which they held from time immemorial, and that upon the creation of reservations, rights were ceded by the Indians and that the government in return reserved to the Indians on those reservations certain rights.

Again, the problem is one of a particular character, where the courts have held that because of the background of dealings with the Indians, that the government in connection with these Indian reservations, is entitled to reserve for the Indians such water as they presently need or will reasonably need in the foreseeable future.

To extend the analogies to say that every time the government acquires land by purchase or condemnation, or sets it aside from the public domain as a reserve, that the government then acquires the right, state law notwithstanding, to appropriate such water as it needs by self help in derogation of the state statutes and procedure would greatly expand the limited principles developed in the three categories of cases heretofore mentioned. Let us analyze the impact of the rule if broadened in line with the government contention.

### Date of Acquisition or Creation of the Reserved Land

What is the significance of the date of the establishment of the reservation? In Federal Power Commission v. State of Oregon, 1955, 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 the Indian reservation on one side of the dam had been reserved for power purposes since 1910 and 1913, and the land on the other side of the dam was reserved for power purposes since at least 1909. Does it make any material difference when the reser-

vation was made? As a matter of logic, the reservation at Camp Pendleton, made by the acquisition of the lands in 1942, and following, should be as effective as though made in 1910. The power of the government to constitute the reservation stems from the Property Clause of the U. S. Constitution, Art. IV, Sec. 3, Clause 2. Federal Power Commission v. State of Oregon, 1955, 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215; Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313.

If the government has the power, what difference does it make whether the reservation is old or newly created, where no vested rights are involved? The power and right—following up the government contention, *is unlimited as to time.* It would pertain to all existing reservations and all new ones created.

## LOCATION OF WATER TAKEN

Assuming the United States has such power, its exercise would be unlimited as to *place.* In our case the stream runs through the reservation. But the power as contended for by the government, would be equally as valid if the stream ran through another watershed removed from the reservation. Since the government says "we are taking unappropriated water—we are exercising a right to take and use water without complying with the present state procedure", why can not the government take unappropriated water anywhere in the state. If this is a right and power, the United States may exercise without bowing to what the government calls the "police power of the state," what obstacle exists? It would logically follow that the United States would have the right to take and use unappropriated water existing in any stream of the state without complying with state law or procedure. Truly this right would be unlimited as to *place.*

The Indian cases relied on by the government were cases where the water was on the land reserved or bordering it but the government has shown no indication in this case to limit its claims, in fact it keeps continually broadening its claims. We see no material distinction between situations where the stream is *on* or *borders* the reservation or where it is 500 miles away, insofar as the government contention is concerned.

We pause merely to note what an impact such a rule would have on state procedure or actions to allot or apportion, unappropriated water. e. g.:—A lengthy state hearing has been completed and a decision is being prepared. The government condemns or buys land on the stream or elsewhere, or recalls a reservation it already owns, which needs water. It takes the water and state procedures are nullified.

Should this power of the government be extended beyond the specific instances above referred to? We think not. We believe that such power by the United States should be limited in those specific instances where Congress has spoken and the courts have been able to perceive a clear authorization for the use of that power. We return to this problem later, viewed in a slightly different aspect.

We think that Trelease, Professor of Law at the University of Wyoming, in his article, "Government Ownership and Trusteeship of Water," 45 Cal.L.R. 638, is correct in his statement, page 651, "By and large, the Supreme court has never used property concepts in deciding water cases. The *interstate suits* have been based upon apportionment of water between individual users who are represented by their states in the controversy," (e. g. State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815; State of Wyoming v. State of Colorado, 1922, 259 U.S. 419, 42 S.Ct. 552, 66 L.Ed. 999) "and while a sovereign interest in the prosperity of the lands watered by the river has been recognized" (State of Kansas v. State of Colorado, 1907, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956) "the apportionment has been to the states as representatives not as owners."

"In those cases in which *state and federal interests*—or state-based and federally-based interests—have *conflicted,*

the Court has scrupulously based its decisions on the question of the allocation of sovereign power among the units of a federated government. In United States v. Rio Grande Dam and Irrigation Co., [1899, 174 U.S. 690, 19 S.Ct. 770, 43 L. Ed. 1136] the holding was that the federal government had superior power to protect the navigability of a river from state-authorized action. In California Oregon Power Co. v. Beaver Portland Cement Co., [1935, 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356] the Court construed the Desert Land Act as a recognition of the desirability of state control over water rights, as a local problem, and as a relinquishment to the states of whatever federal power existed because of the ownership of the public lands. In Winters v. United States, [1908, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340] the question of the existence of a state power to curtail the obligations of the United States under a treaty with an Indian tribe was brushed aside. In the Pelton Dam case, [F. P. C. v. State of Oregon, 1955, 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215] the court held that a federally-licensed power project on a non-navigable river, where the dam was situated on reserved lands, could not be blocked by state attempts to regulate the river in the interest of fish conservation."

The two latest water cases in the Supreme Court follow the same pattern. (1) The Supreme Court in Ivanhoe Irrigation Dist. v. McCracken, supra, states [357 U.S. 275, 78 S.Ct. 1183], "At the outset we set aside as not necessary to decision here the question of title to or vested rights in unappropriated waters. Cf. State of Nebraska v. State of Wyoming, 325 U.S. 589, 611–616, 65 S.Ct. 1332, 1347–1349, 89 L.Ed. 1815," and proceeded to decide the case based on the character of the federal project as set up by the Congress. In the cited case State of Nebraska v. State of Wyoming, 1945, 325 U.S. 589, at pages 611–616, 65 S.Ct. 1332, at pages 1347–1350, the court disposed of the government claim to all the unappropriated waters of the United States, by saying the issue was "largely academic so far as the narrow issues of this case are concerned." 325 U.S. at page 616, 65 S.Ct. at page 1350. (2) City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed. 2d 1345, is based on the power of the government under the commerce clause, over navigable waters and the action of Congress in formulating a detailed and comprehensive plan for developing the power resources of the country.

Trelease further states, (idem p. 652), referring to conflicts between State and Federal government created by withdrawals or reservations from the public domain, "that such conflicts when they arise as they surely will, will [not] * * * be settled by concepts of 'ownership,' by examining the title of the federal government and the states, by interpreting the treaties, acts of Congress, executive orders withdrawing lands, and state constitutions as if they were deeds in the abstract of title to a farm. *Rather, there are two other questions here, one of the power of the Federal government and one of the appropriateness of the exercise of that power.* (Emphasis added.)

We pose a third question:—Who has authority to say whether this power should be exercised, (a) Hon. J. Lee Rankin, Solicitor General, (b) This Court or (c) the Congress of the United States?

Let us follow through with Trelease's analysis.

### (1) The Power of the Federal Government

There is absolutely no doubt as to the *power* of the Federal government to take what it needs for its public uses; if vested rights are involved, the government will obviously be required to pay compensation. In Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 1183, 2 L.Ed.2d 1313, Justice Clark, speaking for the majority, states:

" * * * At the outset we set aside as not necessary to decision here the question of title to or vested rights in unappropriated water. Cf. State of

Nebraska v. State of Wyoming, 1945, 325 U.S. 589, 611–616, 65 S.Ct. 1332, 1347–1349, 89 L.Ed. 1815. If the rights held by the United States are insufficient, then it must acquire those necessary to carry on the project, United States v. Gerlach Live Stock Co., supra, at 739 of 339 U.S., at page 962 of 70 S.Ct., paying just compensation therefor, either *through condemnation or, if already taken, through action of the owners in the courts.* As we see it, the authority to impose the conditions of the contracts here comes from the power of the Congress to condition the use of federal funds, works, and projects on compliance with reasonable requirements. And, again, if the enforcement of those conditions impairs any compensable property rights, then recourse for just compensation is open in the courts. * * * "

(2) *Should the Power be Exercised*

We come then to the next question, should the government having in mind the relationship of the functions of the state and federal government as units in a federated system of government, exercise this right in derogation of the right of the state to control the allocation of unappropriated water. California Oregon Power Co. v. Beaver Portland Cement Co., 1935, 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356, was limited in its effect to the land in the public domain. The court said, at page 155 of 295 U.S., at page 728 of 55 S.Ct.:

" * * * The effect of these acts" (referring to the Acts of 1866, 1870 and the Desert Land Act of 1877) "is not limited to rights acquired before 1866. *They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the* *nonnavigable waters on the public domain.* Jones v. Adams, 19 Nev. 78, 86, 6 P. 442; Jacob v. Lorenz, 98 Cal. 332, 335, 336, 33 P. 119 * * * " (Emphasis added.)

And at page 163 of 295 U.S., at page 731 of 55 S.Ct.:

"Second. Nothing we have said is meant to suggest that the act," (Desert Land Act, Feb. 27, 1877) "as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. * * * "

And at page 164 of 295 U.S., at page 731 of 55 S.Ct.:

" * * * The Desert Land Act does not bind or purport to bind the states to any policy. *It simply recognizes and gives sanction, insofar as the United States and its future grantees are concerned, to the state and local doctrine of appropriation,* and seeks to remove what otherwise might be an impediment to its full and successful operation. See State of Wyoming v. State of Colorado, 259 U.S. 419, 465, 42 S.Ct. 552, 66 L.Ed. 999. * * * " (Emphasis added.)

Following the above quote, the court sets forth footnote 2.

"In this connection it is not without significance that Congress, since the passage of the Desert Land Act, has repeatedly recognized the supremacy of state law in respect of the acquisition of water for the reclamation of public lands of the United States and lands of its Indian wards * * * (citing two examples).

Additional examples could have been cited by the court in 1935, and since then Congress has added many more. There is an almost unbroken line of statutes by which Congress has deferred to state laws concerning water. They are cited in the margin [1] and begin with the Act

1. Act of July 26, 1866, Rev.Stat. § 2339 (1875), 30 U.S.C.A. § 51 (1952); Act of July 9, 1870, Rev.Stat. §§ 2339, 2340 (1875), 43 U.S.C.A. § 661 (1952); Desert Land Act of March 3, 1877, 19 Stat. 377, 43 U.S.C.A. § 321 (1952); Section 18 of the Act of March 3, 1891, 26 Stat. 1101, 43 U.S.C.A. § 946 (1952); Act of

of July 26, 1866, and run through Section 7 of the Colorado Storage Project Act of 1956, (70 Stat. 109).

Sections, 2(a) and 3(c) of the Act of July 28, 1954, relating to the DeLuz Dam on the Santa Margarita River, (68 Stat. 577) is particularly significant, since it involves the stream in this case and this controversy.

"Sec. 2. (a) *In the interest of comity between the United States of America and the State of California and consistent with the historic policy of the United States of America of Federal noninterference with State water law, the Secretary of the Navy shall promptly comply with the procedures for the acquisition of appropriative water rights required under the laws of the State of California* as soon as he is satisfied, with the advice of the Attorney General of the United States, that such action will not adversely affect the rights of the United States of America under the laws of the State of California."

"Sec. 3. (c) *For the purposes of this Act the basis, measure, and limit of all rights of the United States of America pertaining to the use of water shall be the laws of the State of California:* Provided, That nothing in this Act shall be construed as a grant or a relinquishment by the United States of America of any of its rights to the use of water which it acquired according to the laws of the State of California either as a result of its acquisition of the lands comprising Camp Joseph H. Pendleton and adjoining naval installations, and the rights to the use of water as a part of said acquisition, or through actual use or prescription or both since the date of that acquisition, if any, or to create any legal obligation to store any water in DeLuz Reservoir, to the use of which it has such rights, or to require the division under this Act of water to which it has such rights." (Emphasis added.)

Also particularly pertinent is Act of July 10, 1952, Ch. 651, Title 2, Sec. 208, 66 Stat. 560, 43 U.S.C.A. § 666.

"* * * (a) Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, *where*

February 26, 1897, 29 Stat. 599, 43 U.S.C.A. § 664 (1952); Section 1 of the Act of June 4, 1897, 30 Stat. 36, 16 U.S.C.A. § 481 (1952); Section 8 of the Reclamation Act of June 17, 1902, 32 Stat. 390, 43 U.S.C.A. §§ 372, 383 (1952); Section 4 of the Act of February 1, 1905, 33 Stat. 628, 16 U.S.C.A. § 524 (1952); Section 2 of the Act of February 21, 1911, 36 Stat. 926, 43 U.S.C.A. § 524 (1952); Section 11 of the Act of December 19, 1913, 38 Stat. 242, 250; Sections 9(b), 41 Stat. 1068, 16 U.S.C.A. § 802 (1952), and 27 of the Federal Power Act of June 10, 1920, 41 Stat. 1077, 16 U.S.C.A. § 821 (1952); Section 18 of the Boulder Canyon Project Act of December 21, 1928, 45 Stat. 1065, 43 U.S.C.A. § 617q (1952); Section 14 of the Boulder Canyon Project Adjustment Act, 54 Stat. 779 (1940), 43 U.S.C.A. § 618m (1952); Section 3 of the Taylor Grazing Act of June 28, 1934, 48 Stat. 1270, 43 U.S.C.A. § 315b (1952); Water Conservation Act of 1939, 53 Stat. 1419, 16 U.S.C.A. § 590z–1(b) (2) (1952); Great Plains Water Conservation and Utilization Projects Act of October 14, 1940, 54 Stat. 1120, 16 U.S.C.A. § 590z–1(b) (2) (1952); Section 1 of the Flood Control Act of December 22, 1944, 58 Stat. 887, 33 U.S.C.A. § 701–1 (1952); Reservation (c) to the Mexican Water Treaty, U.S. Treaty Ser. No. 994, 59 Stat. 1219, 1265 (1945); National Parks Act of 1946, 60 Stat. 885, 16 U.S.C.A. § 17j–2(g) (1952); Section 208 of the Act of July 10, 1952, 66 Stat. 560, 43 U.S.C.A. § 666 (1952); Section 3(c) of the Submerged Lands Act of May 22, 1953, 67 Stat. 30, 43 U.S.C.A. § 1311 (e) (Supp. IV, 1957); Section 3(c) of the Act of July 28, 1954, relating to the DeLuz Dam of the Santa Margarita River, 68 Stat. 577; Section 4(b) of the Act of July 23, 1955, 69 Stat. 368, 30 U.S.C.A. § 612(b) (Supp. IV 1957); Section 4 of the Act of July 2, 1956, relating to section 9, subsection (d) and (e) of the Reclamation Act of 1939, 70 Stat. 483, 43 U.S.C.A. § 485h–4 (Supp. IV 1957); Section 7 of the Colorado River Storage Project Act, 70 Stat. 109 (1956), 43 U.S.C.A. § 620f (Supp. IV 1957).

* Now West's Ann.Cal. Water Code, § 1240.

*it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law,* by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. *The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty,* and (2) *shall be subject to the judgments,* orders, and decrees of the court having jurisdiction, and may obtain review thereof, *in the same manner and to the same extent as a private individual under like circumstances:* Provided, That no judgment for costs shall be entered against the United States in any such suit.

"(b) Summons or other process in any such suit shall be served upon the Attorney General or his designated representative.

"(c) Nothing in this section shall be construed as authorizing the joinder of the United States in any suit or controversy in the Supreme Court of the United States involving the right of States to the use of the water of any interstate stream. \* \* \* "

(3) *Who determines if this power shall be exercised?*

▆▆▆ Assuming arguendo, that the government has the power generally, to take unappropriated water which it finds useful for a Military reservation, how is this power to be exercised? Who makes the determination as to whether the government should exercise the limits of its power? Who decides on a basis of comity, that the United States yield to the states as members of a federated government, a right to control and apportion unappropriated water?

The Constitution, in Art. IV, Sec. 3, c. 2, states, "The Congress shall have the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States \* \* \* "

This is generally referred to as the Property Clause of the Constitution and has been relied upon in various of the Power cases, together with the Welfare clause, as a source of the power of the government to reserve lands for governmental use.

The government of the United States consists of three branches, the Executive, Legislative and the Judicial, and a delicate mechanics of checks and balances regulate the exercise of the respective powers of these three branches.

We submit the inquiry, does the Honorable J. Lee Rankin, Solicitor General of the United States, a member of the Executive branch of the government, have the power to make this determination? We think not. He may urge upon a court for consideration, the problem of whether a certain power under the Property Clause has been exercised by the United States, but we think that the Constitution makes it clear that the Congress has authority to deal with and dispose of the property of the United States and inferentially to therefore claim for the government the right to take or appropriate unappropriated water.

We think the function of the Judiciary is to determine whether or not Congress has so acted.

"The role of the judiciary in reviewing the legislative judgment is a narrow one in any case", United States v. Twin City Power Co., 1956, 350 U.S. 222, 224, 76 S.Ct. 259, 260, 100 L.Ed. 240.

There is pending in the Congress of the United States, the Barrett Bill, with two versions, both bearing No. S 863. See "Water Rights and Federalism—The Western Water Rights Settlement Bill of 1957 by Chas. E. Corker, 45 Cal. L.Rev. 604. This bill is directed at the identical problem which now faces this court. The position of the Honorable J. Lee Rankin at hearings on the Bill, to say the least, is extreme. In Water Rights and Federalism etc., supra, page 612, note 26, is set forth the questions asked by Senator Kuchel and answers

by Mr. Rankin. The last question and answer is particularly pertinent.

"Sen. Kuchel: So, that in your opinion this Congress is powerless to require federal properties thereafter acquired to be subject to the laws of the state with respect to water? Mr. Rankin: I think that is true. * * *" (Hearings on S 863 before the Subcommittee on Irrigation and Reclamation of the Senate Committee on Interior and Insular Affairs, 84th Congress 2d Session, 248 [1956] at 266–267.)

Has the government of the United States through the Congress elected to exercise the power to take and/or appropriate unappropriated water, except in the specific fields heretofore discussed?

Congress has made it clear that when it desires to empower an executive branch of the government or some statutory agency or commission, to exercise the general power of the federal government, it has done so by express authority.

In the case of the use of water and reservations of land for *power purposes,* the Congress of the United States, by the Federal Power Act has expressly authorized such action by the Federal Power Commission (Federal Power Act of June 10, 1920, 41 Stat. 1063, Act of Aug. 26, 1935, 49 Stat. 838, as amended from time to time [16 U.S.C.A. §§ 791a–825u]). See particularly Sec. 797(e), Title 16 U.S.C.A., authorizing the Federal Power Commission to issue licenses for the use of streams and waters, and Sec. 818, Title 16 U.S.C.A. reserving United States lands from entry.

Further examples of Congressional intent with respect to the exercise of governmental powers are to be found in acts dealing with Public Lands. 43 U.S.C.A. § 141 (June 25, 1910, c. 421, § 1, 36 Stat. 847) authorizes the President to withdraw and reserve lands for water power sites, irrigation and other purposes. By Executive Order No. 10355 dated May 26, 1952, 17 F.R. 4831, U.S.Code Congressional and Administrative News, p. 1058, the President delegated this authority to the Secretary of the Interior. The Secretary of the Interior has been charged with the responsibility of reporting such withdrawals to Congress (43 U.S.C.A. § 143, June 25, 1910, c. 421, § 3, 36 Stat. 848). The Secretary of the Interior "in his discretion" has also been authorized to withdraw lands in Indian Reservations for power or reservoir sites. 43 U.S.C.A. § 148 (June 25, 1910, c. 431, § 13, 36 Stat. 858).

In dealing with *reclamation and irrigation of lands* by the Federal Government, Congress has been no less precise in its intent to have the powers vested under their acts exercised by specific agencies. The Secretary of the Interior has been expressly authorized to "perform *any and all acts* and to make such rules and regulations as may be necessary and proper * * *" to carry out the Reclamation Acts, 43 U.S.C.A. § 373; (June 17, 1902, c. 1093, § 10, 32 Stat. 390; Aug. 13, 1914, c. 247, § 15, 38 Stat. 690.) Not only did Congress give no express authority to the Secretary of the Interior, but it instructed the Secretary to proceed in Conformity to State laws in carrying out the provisions of the Act, 43 U.S.C.A. § 383 (June 17, 1902, c. 1093, § 8, 32 Stat. 390).

In Title 16 U.S.C.A. Conservation, Chap. 3C, § 590y, Congress *authorized the Secretary of Agriculture* to "construct water conservation and utilization projects." Sec. 590z–1, lists the prerequisites for the construction of such projects, and provides no construction shall be undertaken "until (1) * * * and (2) the Secretary has found (i) that water rights adequate for the purposes of the project have been acquired. * * * or that such water rights have been initiated and in his judgment can be *perfected in conformity with State law* * * * and (ii) that such water rights can be *utilized* for the purposes of the project in *conformity with State law* * * *" [Emphasis added.]

In the instance of the *Indian reservations*, they arose, prior to 1871, by treaty between the government and the Indian tribe, and such treaties were subject to ratification by the Congress pursuant to the terms of the Constitution. After 1871 reservations were created by acts of Congress or by executive order pursuant to a statute of the Congress, or by statute authorizing the Secretary of the Interior to set aside the lands as reservations for the benefit of the Indians.

An inspection of Winters v. United States, 1908, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340, shows that on April 15, 1874, by Act of Congress, 18 Stat. 28, a reservation was created. Subsequently by Act of May 1, 1888, Fort Belknap Reservation, having been by treaty limited and defined (25 Stat. 124), the treaty was confirmed (25 Stat. 133). The Winters case held that there was impliedly reserved to the Indians by the treaty, the use of waters.

In 1871 the policy of the government that had existed for nearly 100 years of using treaties with the Indians was changed by the Act of March 3, 1871, c. 120, 16 Stat. 566. See Matter of Heff, 1905, 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848. The present section, in identical language, is carried over into Section 71, Title 25 U.S.C.A. and provides, *"Future treaties with Indian tribes.* No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired. [R.S. 2079]." Thereafter setting by of reservations, was handled by Act of Congress or by the orders of an executive department, authorized to act by Congress.

Throughout Title 25 on "Indians", are various examples of Congressional authorization given the Secretary of the Interior. For example, Sec. 381 concerning the use of water on Indian lands; Sec. 382, "Irrigation projects under Reclamation Act"—arrangements to be made by the Secretary of the Interior in connection with Indian lands; Sec. 465, authorizing the Secretary of the Interior to acquire through purchase, relinquishment, gift, exchange or assignment, any interest in lands or water rights within or without existing reservations for the use of the Indians; Sec. 467, authorizing the Secretary of the Interior to proclaim new Indian reservations on lands acquired.

In the field of *condemnation,* the Constitution impliedly gives the government the right to take private property, upon payment of just compensation (Amend. V). The Congress, by various statutes, has provided that executive departments and statutory agencies and bodies may condemn private property for their necessary needs, and have laid out the procedure for so doing, e. g. Sections 171 and 172, Title 50 U.S.C.A.; Sections 258a–258e Title 40 U.S.C.A.; Rule 71A, Rules of Civil Procedure, adopted pursuant to Congressional authority. For a list of various condemnation statutes, see Notes of Advisory Committee on Rules, following Rule 71A, Rules of Civil Procedure.

What has Congress done which could lead this court to conclude that some agency of the Executive Branch, (e. g. the United States Navy, or officials acting in its behalf) has been empowered to take and/or appropriate unappropriated waters in connection with the military reservation at Camp Pendleton?

(1) The Congress has passed a series of statutes heretofore set forth in the footnote (supra) requiring in instance after instance, that the government yield to the states in problems concerning water.

(2) In the DeLuz Bill, concerning the proposed dam on the Santa Margarita River, the Congress expressly stated, limited of course, as to that project, "In the interests of comity between the United States and the State of Cali-

fornia, and consistent with the historic policy of the United States of America of federal non interference with state water law, the Secretary of the Navy shall promptly comply with the procedures for the acquisition of appropriative water rights required under the laws of the state of California. * * * "

(3) In the Act of July 10, 1952, an appropriation bill, the Congress prohibited the use of Department of Justice funds for the preparation or prosecution of this particular litigation, Act of July 10, 1952, Sec. 208(d), 66 Stat. 560. "Sec. (d) None of the funds appropriated by this title may be used in the preparation or prosecution of the suit in the United States District Court for the Southern District of California, Southern Division, by the United States of America against Fallbrook Public Utility District, a public service corporation of the State of California, and others.

"This title may be cited as the 'Department of Justice Appropriation Act, 1953' * * * "

(4) Where Congress has intended that the federal government or its agencies take or use water rights, it has spoken expressly—e. g. the power and reclamation projects, the matters of reserving Indian lands, etc.

Against this record we find that

(1) The Congress has appropriated money for the purchase and condemnation of the property which now constitutes Camp Pendleton and the reservation involved.

(2) The Congress has, from time to time made additional appropriations for the Marine Corps at Camp Pendleton since the filing of this litigation.

(3) That no Act of Congress has specifically said that the United States, through an executive department, the United States Navy, might take or use unappropriated waters on a military reservation in derogation of State law.

In view of the foregoing matters, the contention of the United States that the government has elected to exercise this power, falls completely. We fail to see how Congress, by any of its actions, has so exercised the power vested in it under the Property Clause, to empower any Executive agency to use, take or appropriate, unappropriated waters for Military reservations.

Many things could have been done or said in the Bills appropriating money for the condemnation or acquisition of Military reservations. Congress could have stated that the government or an agency thereof, was authorized to also use, acquire, take or appropriate unappropriated waters for the use of the reservations. The Congress did not do so. To sustain the contention of the government on the record before us, assumes that the Congress, by some uncited or undiscovered Act, has delegated authority to, and expressed its intention that the United States Navy might exercise this vast power.

### VII–I

The Law of Percolating Water, That Is Waters Which Are not Part of the Santa Margarita River or Its Tributaries or Underground Basins Which Are a Part of Said Stream

The above problem was also posed to counsel.—The government responded as follows: "*This litigation pertains only to the use of waters constituting part of the stream system of the Santa Margarita River.*" As a consequence, it would seem logically to follow that the only rights to be adjudicated would fall within the categories of (1) surface waters of the Santa Margarita River, (2) its tributaries, (3) underground basins which are a part of that river or its tributaries. It would also seem logical to conclude that there would be excluded from the litigation " * * * percolating waters, that is waters which are not part of the Santa Margarita River or its tributaries. If those predicates are correct, the matter is purely academic and needs no further consideration." The government further asserted that the existence of percolating waters was a question of fact.

The court concludes that all parties are agreed upon the law on this problem, but summarizes herewith the general rules of law applicable.

Initially in determining whether or not there is percolating water, there arises the question of fact as to whether or not the water is a part of the stream. Our inquiry propounded to counsel, assumed that the water to which this inquiry was directed, was not part of the River or its tributaries, and not part of the underground basins connected with or a part of the River. We are particularly concerned therefore, with this particular type of water referred to in the inquiry and the water rights pertaining thereto.

This suit has been brought by the United States to quiet title to its right to water which is part of the River. It claims no water rights and can claim none, except as they pertain to the River. On the *factual problem* it has been recognized by California decisions that a percolating groundwater supply, although not part of the flow of a stream, may nevertheless be hydrologically connected with it, with the result that the extraction of water from either source diminishes the amount of water in the other (City of Lodi v. East Bay Municipal Utility Dist., 1936, 7 Cal.2d 316, 334, 60 P.2d 439; Hudson v. Dailey, 1909, 156 Cal. 617, 627–628, 105 P. 748; Cohen v. La Canada Land & Water Co., 1904, 142 Cal. 437, 438–439, 76 P. 47; McClintock v. Hudson, 1903, 141 Cal. 275, 280, 74 P. 849). In such a situation, the percolating groundwater and the stream are regarded as one common water supply (Hudson v. Dailey, 1909, 156 Cal. 617, 628, 105 P. 748); and in considering the respective rights of those who secure water from the two interconnected sources, it is "immaterial whether the [underground] waters * * * were or were not part of an underground stream, provided the fact be established that this extraction from the ground diminished to that extent, or to some substantial extent, the water flowing in the stream" (McClin-tock v. Hudson, 1903, 141 Cal. 275, 281, 74 P. 849, 851). The rights are correlated just as they would be from any other common source, with riparians and overlying owners having "coequal, except as to quantity, and correlative" rights to use their reasonable share of the water on their riparian or overlying land (Hudson v. Dailey, 1909, 156 Cal. 617, 628, 105 P. 748, 753), and appropriators having the right to use any remaining surplus in the order of their priority (City of Lodi v. East Bay Municipal Utility Dist., 1936, 7 Cal.2d 316, 333–339, 60 P.2d 439).

For a quick summary as to the law of percolating waters and what constitutes streams there appears in 25 Cal.Juris pp. 1097–1103, Waters, Sections 106–110, and 26 Cal.Juris pp. 267–272, Sections 477–484, a general discussion of the problem.

Many of the rules of law governing percolating waters not part of the flow of a stream are summarized in the case of City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 207 P.2d 17. We do not believe we can improve upon the succinctness and clarity of the California Supreme Court's summary and therefore set it forth verbatim (33 Cal.2d at pages 925–927, 207 P.2d at page 28):

"Rights in water in an underground basin, so far as pertinent here, are classified as overlying, appropriative, and prescriptive. Generally speaking, an overlying right, analogous to that of a riparian owner in a surface stream, is the right of the owner of the land to take water from the ground underneath for use on his land within the basin or watershed; the right is based on ownership of the land and is appurtenant thereto. See Hillside Water Co. v. [City of] Los Angeles, 10 Cal.2d 677, 686, 76 P.2d 681; Miller v. Bay Cities Water Co., 157 Cal. 256, 279–280, 107 P. 115, 27 L.R.A.,N.S., 772; 26 Cal.Jur. 271–277; 2 Wiel, Water Rights [3d ed., 1911], §§ 1100–1105, pp. 1040–1045. The right of an appropriator depends upon an actual taking of water. See

26 Cal.Jur. 277. The term 'appropriation' is said by some authorities to be properly used only with reference to the taking of water from a surface stream on public land for non-riparian purposes. See Wiel, Water Rights [3d ed., 1911] §§ 228, 1107, 1158, 1159, and § 231 in the 'reprint ed.' of the 3d ed.; Farnham, Waters and Water Rights [1904] § 672a; 56 Am.Jur. 599. The California courts, however, use the term to refer to any taking of water for other than riparian or overlying uses. City of San Bernardino v. City of Riverside, 186 Cal. 7, 13–14, 198 P. 784; Burr v. Maclay Rancho Water Co., 154 Cal. 428, 436, 98 P. 260; Katz v. Walkinshaw, 141 Cal. 116, 135, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am.St.Rep. 35; see 26 Cal.Jur. 273–274. Where a taking is wrongful, it may ripen into a prescriptive right.

"Although the law at one time was otherwise, it is now clear that an overlying owner or any other person having a legal right to surface or ground water may take only such amount as he reasonably needs for beneficial purposes. Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am.St.Rep. 35; Peabody v. City of Vallejo, 2 Cal.2d 351, 40 P.2d 486; Cal.Const., art. XIV, § 3. Public interest requires that there be the greatest number of beneficial uses which the supply can yield, and water may be appropriated for beneficial uses subject to the rights of those who have a lawful priority. Peabody v. City of Vallejo, 2 Cal.2d 351, 368, 40 P.2d 486. Any water not needed for the reasonable beneficial uses of those having prior rights is excess or surplus water. In California surplus water may rightfully be appropriated on privately owned land for nonoverlying uses, such as devotion to a public use or exportation beyond the basin or watershed. Peabody v. City of Vallejo, 2 Cal.2d 351, 368–369, 40 P.2d 486; City of San Bernardino v. City of Riverside, 186 Cal. 7, 29, 30, 198 P. 784; Burr v. Maclay Rancho Water Co., 154 Cal. 428, 436, 98 P. 260;

Katz v. Walkinshaw, 141 Cal. 116, 135, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am.St.Rep. 35; see 26 Cal.Jur. 32 et seq., 273–274.

"It is the policy of the state to foster the beneficial use of water and discourage waste, and when there is a surplus, whether of surface or ground water, the holder of prior rights may not enjoin its appropriation. Peabody v. City of Vallejo, 2 Cal.2d 351, 368–369, 372, 40 P.2d 486; see 26 Cal.Jur. 277. Proper overlying use, however, is paramount, and the right of an appropriator, being limited to the amount of the surplus, must yield to that of the overlying owner in the event of a shortage, unless the appropriator has gained prescriptive rights through the taking of non-surplus water. *As between overlying owners, the rights, like those of riparians, are correlative and are referred to as belonging to all in common; each may use only his reasonable share when water is insufficient to meet the needs of all.* Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am.St.Rep. 35; see 26 Cal.Jur. 269–273, 276; cf., 25 Cal.Jur. 1063–1067. As between appropriators, however, the one first in time is the first in right, and a prior appropriator is entitled to all the water he needs, up to the amount that he has taken in the past, before a subsequent appropriator may take any. City of San Bernardino v. City of Riverside, 186 Cal. 7, 26–28, 198 P. 784; cf., Civ.Code, § 1414.

"Prescriptive rights are not acquired by the taking of surplus or excess water, since no injunction may issue against the taking and the appropriator may take the surplus without giving compensation; however, both overlying owners and appropriators are entitled to the protection of the courts against any substantial infringement of their rights in water which they reasonably and beneficially need. Peabody v. City of Vallejo, 2 Cal.2d 351, 368–369, 374, 40 P.2d 486. Accordingly, an appropriative taking of water which is not surplus is wrongful and may ripen into a

prescriptive right where the use is actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under claim of right. City of San Bernardino v. City of Riverside, 186 Cal. 7, 22–23, 198 P. 784; Katz v. Walkinshaw, 141 Cal. 116, 135, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am.St.Rep. 35; 25 Cal. Jur. 1178, 1157–1158; 1 Cal.Jur. 585; 26 Cal.Jur. 278–279; cf. Wutchumna Water Co. v. Ragle, 148 Cal. 759, 764–765, 84 P. 162. To perfect a claim based upon prescription there must, of course, be conduct which constitutes an actual invasion of the former owner's rights so as to entitle him to bring an action. City of Los Angeles v. City of Glendale, 23 Cal.2d 68, 79, 142 P.2d 289. Appropriative and prescriptive rights to ground water, as well as the rights of an overlying owner, are subject to loss by adverse user. This is in accord with the rule announced in cases dealing with water in a surface stream. See Yankee Jim's Union Water Co. v. Crary, 25 Cal. 504, 508–509, 85 Am.Dec. 145; Big Rock Mutual Water Co. v. Valyermo Ranch Co., 78 Cal.App. 266, 273, 248 P. 264; Peabody v. City of Vallejo, 2 Cal.2d 351, 374, 40 P.2d 486; Duckworth v. Watsonville Water & Light Co., 150 Cal. 520, 529–532, 89 P. 338; Davis v. Gale, 32 Cal. 26, 35, 91 Am.Dec. 554; 3 Farnham, Waters and Water Rights (1904), § 680a, P. 2106; 1 Wiel, Water Rights [3d ed., 1911], § 580, pp. 625–626; 56 Am.Jur. 773." (Emphasis added.)

The holding in City of Pasadena v. City of Alhambra, supra, was to the effect that when a particular ground-water basin is being overdrawn by reason of the extraction of more water than is replenished under natural conditions, both overlying owners and appropriators who participate in such overdraft by pumping for the prescriptive period acquire prescriptive rights as against each other. The result is that all have rights of the same priority and all must accept the same pro rata reduction in pumping in order to halt the overdraft (33 Cal.2d at pages 927–933, 207 P.2d at pages 29–33.)

In City of San Bernardino v. City of Riverside, 186 Cal. 7, at pages 14–15, 198 P. 784, at page 787, the California Supreme Court said:

"When a stream runs over porous material saturated with water, and the underground waters support the stream, either by upward or lateral pressure, or feed it directly, persons having rights in the stream will be protected against a depletion thereof by adverse diversions of such underground waters if they are injured thereby. *There may be a point of distance from the stream at which a diversion of such underground water will have so little effect on the stream that it will not be actionable. It is ordinarily a question for the trial court to determine whether or not this is true in the particular case before it.* (Emphasis added) These matters are considered as applied to differing conditions in City of Los Angeles v. Pomeroy, 124 Cal. [597] 617, 57 P. 585; Miller v. Bay Cities W[ater] Co., 157 Cal. 256, 107 P. 115 [27 L.R.A.,N.S., 722]; Hudson v. Dailey, 156 Cal. [617] 626, 105 P. 748; McClintock v. Hudson, 141 Cal. [275] 279, 74 P. 849, and other cases, and will be adverted to herein in connection with the rights of Riverside Water Company.

"The law of so-called 'percolating' waters presents the principal questions in issue in this case. These waters are almost invariably found in permeable material of more or less density, such as sand, gravel, and boulders intermixed, in which the water will move readily by the force of gravity. The original title to such water was in the owner of the land in which it is found, under the elementary rule that the title and ownership of land extends to the center of the earth, and includes everything within the cone having the superficial boundaries of the land for the base and the center of the earth for its vertex. The transfer of the land by the govern-

ment to the individual passed this title, and gave the land owner the right to all the water therein. Originally in this state it was assumed that this title was absolute, and that each land owner could take out as much of such underground water as he pleased, regardless of the effect thereof on other lands, provided he took it on his own land, and without a malicious intent to injure others. But the immediate effect of such taking of water out of such land usually is to draw out the water from the surrounding land into the void or depression caused in the water plane in the land from which it is taken, and this, if continued, lowers the subsurface water plane in the vicinity thereof, and eventually, to a greater or less extent, throughout the basin in which the lands are situated. If there is artesian pressure therein, this will reduce the pressure. In this manner the owner of one tract of land in such basin could take such water from another tract without an actual trespass thereon, and thus an injury could be done which the owner of the other tract could not prevent by any physical means, and a resort to the courts was necessary. In cases presenting these facts the original assumption of absolute ownership in such water was held untenable under the conditions existing in this state, and the *doctrine that the respective rights of owners of land in the waters percolating or lying beneath the surface are reciprocal and correlative as to each other was adopted.* Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am. St.Rep. 35; Newport v. Temescal W[ater] Co. 149 Cal. [531] 535, 87 P. 372, 6 L.R.A.,N.S., 1098; Burr v. Maclay Rancho Water Co., 154 Cal. 428, 98 P. 260; and other cases." (Emphasis added.)

To summarize: water which is not a part of the Santa Margarita, its tributaries or underlying basins, and factually not a part of the stream, or does affect the stream is not the subject of the relief sought by the government in this case. The existence of such water when found by the trier of fact will entitle the owner of the property on which it is located to a decree that the water is not part of the River. Such owners will, under the cases cited above, have correlative rights with adjoining owners in connection with that water but it is not the purpose of this case to adjudicate such correlative rights to water which is not part of the stream.

## VII–J

### Rights Claimed by Condemnation —Direct and Inverse

The United States claims rights to the use of water by both direct and inverse condemnation.

#### (A) *Direct Condemnation*

It is conceded by all parties that the United States acquired by the condemnation and/or purchase of the Rancho Santa Margarita, *all water rights then owned by the Rancho.* These were (1) riparian rights, (2) claimed appropriative rights (which we not now pass upon), (3) claimed prescriptive rights (as to which our pretrial ruling elsewhere in this memorandum, may or may not be dispositive) and (4) rights under the Vail judgment (not here considered).

#### (B) *Inverse Condemnation*

This claim of the United States was first advanced on October 21, 1957. The stipulation of November 29, 1951, provided that the United States claimed only rights from the purchase of the Rancho, together with any rights "gained by prescription or use or both," since the acquisition of the Rancho. This claim of inverse condemnation can be said to have been "lurking" in the words "by use."

Since the rights of the United States are to be measured by California law under the stipulation of Nov. 29, 1951, it follows that its claims to rights through "use" based by inverse condemnation, must stand or fall by California law. Without the existence of the stipulation, we think the result would be the same.

West's Ann.California Code of Civil Procedure, Sec. 1238 provides that the right of eminent domain may be exercised in behalf of the following public uses "Fortifications, magazines, arsenals, Navy yards, Navy and Army stations * * * and all other public uses authorized by the Government of the United States." California case law recognized inverse condemnation, occasionally referred to as "reverse" condemnation. "When public use has attached for any recognized reason, *reverse condemnation* proceedings, may be invoked and applied," Hillside Water Co. v. City of Los Angeles, 1938, 10 Cal.2d 677, at page 688, 76 P.2d 681, at page 687 (Emphasis supplied). "The acquisition by the municipality of the water right, for which the holder of the right receives only damages, is 'inverse condemnation'". City of Los Angeles v. City of Glendale, 1943, 23 Cal.2d 68, at page 80, 142 P.2d 289, at page 296. For the same principle, see, Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 40 P.2d 486; Meridian, Limited v. San Francisco, 1939, 13 Cal.2d 424, 90 P.2d 537, 91 P.2d 105; Collier v. Merced Irr. Dist., 1931, 213 Cal. 554, 2 P.2d 790.

In United States v. Gerlach Live Stock Co., 1950, 339 U.S. 725, 729, 70 S.Ct. 955, 94 L.Ed. 1231, the Supreme Court of the United States in holding that inverse condemnation entitled the owners of grass lands downstream from Friant Dam to damages, cited the California cases above and said, "We conclude that claimants' right to compensation has a sound basis in California law," (339 U.S. at page 754, 70 S.Ct. at page 970), and "We think the awards of the Court of Claims" (awarding damages for inverse condemnation) "correctly applied the law of California as made applicable to these claims by Congress." 339 U.S. at page 755, 70 S.Ct. at page 970.

Thus, no problem exists as to the law of inverse condemnation. State and Federal rules are the same. The sole question involved is whether the government has taken water rights by inverse condemnation.

The United States, through its agents, may engage in or carry on activities on behalf of the United States which so interfere with the property rights of another that in effect there is a "taking" by the United States of such property rights. This constitutes "inverse condemnation." The owner of the property so "taken" has a right under the *Tucker Act* (24 Stat. 505 (1887), 28 U.S.C. §§ 1346(a) (2), 1491) to damages for the taking (United States v. Gerlach Live Stock Co., 1950, 339 U.S. 725, 730, 70 S.Ct. 955, 94 L.Ed. 1231; United States v. Dickinson, 1947, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789; United States v. Causby, 1946, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; Hurley v. Kincaid, 1932, 285 U.S. 95, 103, 52 S.Ct. 267, 76 L.Ed. 637; Portsmouth Harbor Land & Hotel Co. v. United States, 1922, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287; United States v. Cress, 1917, 243 U.S. 316, 328–329, 37 S.Ct. 380, 61 L.Ed. 746; United States v. Lynah, 1903, 188 U.S. 445, 468–469, 23 S.Ct. 349, 47 L.Ed. 539; Pumpelly v. Green Bay Company, 1871, 13 Wall. 166, 177, 80 U.S. 166, 177, 20 L.Ed. 557.

Here the last downstream user, the United States, claimed it acquired by reverse condemnation, an upstream right, i. e. the right to have a certain flow of water come on to the lands of the United States. For inverse condemnation to apply, there must have been a "taking"—i. e. an adverse user which took away substantial rights or such an interference with another's right that it amounted to a taking.

The leading United States Supreme Court case on inverse condemnation notes the distinguishing features of the "taking";

"Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by

agreement or in course of time," United States v. Dickinson, 1947, 331 U.S. 745, 748, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789.

 That feature is entirely lacking in our case. The water which the United States diverted and used was surplus to the needs of everyone else in the watershed; otherwise it would not have reached Camp Pendleton. If not used by the United States it would have wasted into the ocean. No one had the right to object to such downstream use; no one was injured by such use; hence no servitude could have been acquired. The Circuit Court of Appeals in its last decision in this case, People of the State of California v. United States, 9 Cir., 235 F.2d 647, stated at page 656: "But the physical possession of the corpus of the water after it enters the enclave and the ability and legal right then to use it for whatever purpose are not evidentiary of a water right, for the right to use water is a property right and is appurtenant to particular parcels of land. We must not fall into the fallacy of believing that, because the United States, by its sovereignty, made use of the corpus of water which entered the enclave as it chose, it thereby acquired property rights in the flow against upper riparians or appropriators under municipal law. * * * Since neither appropriators, riparians nor anyone else could object or prevent such use of water by the United States in the enclave, such use was not adverse to their interests."

In each of the cases cited above involving inverse condemnation, there was a "taking." In United States v. Gerlach Live Stock Co., supra, Friant Dam of the federal Central Valley Project stored, and diverted to other lands, flows of water which the plaintiffs had long used on their downstream riparian land. In United States v. Causby, 1946, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206, the use of airspace directly over the plaintiff's chicken ranch for airplane take-offs and landings at a Government airbase and the noise and glare therefrom made the ranch unusable for raising poultry, and constituted a taking of an easement over the plaintiff's land. In Portsmouth Harbor Land & Hotel Co. v. United States, 1922, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287, the firing of large guns of the United States over the plaintiff's land rendered the land valueless as a summer resort.

In United States v. Dickinson, 1947, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789, a federal dam raised the level of a river and flooded land belonging to the plaintiff. Flooding of land, resulting from navigation improvements, were involved in United States v. Cress, 1917, 243 U.S. 316, 328–329, 37 S.Ct. 380, 61 L.Ed. 746; United States v. Lynah, 1903, 188 U.S. 445, 468, 469, 23 S.Ct. 349, 47 L.Ed. 539; and Pumpelly v. Green Bay Company, 1871, 13 Wall 166, 177, 80 U.S. 166, 177, 20 L.Ed. 557.

No such situation is present in our case. No one has been injured or interfered with in his property rights as a result of the use of water on the government property or the diversion of water by the government out of the watershed but within the reservation confines.

We conclude that the United States has no water rights based on inverse condemnation.

## VIII

### Rulings on Motions

Does This Court's Jurisdiction Over the "Res" Require Determination of Priority of Applications, Etc. and Determination of Fallbrook's Legal Authority and Capacity to Appropriate Water for Irrigation Purposes?

### A

### United States Motion for Summary Judgment

The United States has moved for a summary judgment against the Fallbrook Public Utility District, on the

ground that Fallbrook secured from Rancho Santa Margarita on July 20, 1932, a revocable license to divert from the river ten miner's inches for the purpose of supplying the inhabitants of the Fallbrook P. U. D. with water for domestic uses; that the license was revoked by the United States on July 31, 1948; that applications for *municipal and domestic rights* to the use of water were applied for by Fallbrook in applications #11586 and #11587, filed with the State of California on October 11, 1946; that by its course of conduct, it is evident that Fallbrook sought only water for *municipal and domestic purposes;* that such activity was within the powers conferred on it by Act of the California Legislature of 1921, ch. 560; that claimed priorities or permits for the use of water for the purpose of irrigation are null and void, being ultra vires and beyond the power of the Fallbrook P. U. D.

A further ground for the motion seems to be the contentions that the United States acquired the enclave between January 1942 and January 1943, and secured exclusive jurisdiction over the property; that direct flow rights from the river have been exercised continuously since 1943 "with the full power and authority by the Marine Corps officers;" that large quantities of water have been diverted out of the water shed by the United States; that the applications of Fallbrook to the State of California for water rights were made long after the diversions by the United States; that on June 30, 1948, a right to appropriate water was filed by the Navy with the State of California, application #12576; that thereafter on December 11, 1950, Fallbrook filed amended application #11587 in which Fallbrook made application to appropriate water "for *Domestic, Municipal and Irrigation*" purposes; that no amendment has ever been made to application #11586 to include irrigation uses, although an addition by pen was made by a person unknown, inserting the word "irrigation."

The motion further contends that domestic, municipal, and irrigation uses are defined by California Administrative Code, Title 23, sub-ch. 2, Art. 3, Sec. 664, 661 and 662, respectively; that application #12178 filed November 28, 1947, by Fallbrook concerning Rainbow Creek has been abandoned; that application #12179 filed November 28, 1947, concerning Sandia Creek has been abandoned; that Fallbrook, on July 28, 1952, amended or attempted to amend applications #12178 and #12179, to seek water not only from the creeks named above but from the river; that the attempted amendments and applications #12178 and #12179 have greatly enlarged the claims of Fallbrook to the damage of the United States; that the amendments constitute new applications and that their priority is four years junior to the application #12576 filed by the Navy.

A further ground for the motion is that Fallbrook has not formulated plans for its alleged project, namely to build a dam; that Fallbrook does not have the corporate power to construct the dam or to operate and maintain a distribution system, is not authorized to finance and does not have the financial capacity to undertake the dam.

The memorandum of the United States in support of the motion relies upon West's Ann. California Public Utilities Code, Sec. 15701, providing that a public utility district may be incorporated and managed in unincorporated territory, and upon In re Orosi Public Utility District, 196 Cal. 43, 55–56, 235 P. 1004, 1009, which referred to powers which might be exercised by entities of the nature of Fallbrook, and enumerated them as "the acquisition, construction and use of works for supplying the inhabitants of the district with light, water, power, heat, transportation, telephone service and other means of communication", and on the basis of State statutes and the case last cited, the government contends that Fallbrook's acts in seeking to appropriate water, are ultra vires.

It equates the legal status of Fallbrook to that of a Municipality and relies on West's Ann. California Water Code, Sec. 1461 to the effect that "the application for, or the granting of, a permit to any municipality to appropriate water does not authorize the appropriation of any water for other than municipal purposes."

In a memorandum filed June 30, 1958, it contends that Fallbrook does not have the power to assess lands for irrigation purposes, and that the financial feasibility of the dam is a prime element in effecting an appropriation.

The government argues that upon filing of this quiet title action in 1951, this court acquired jurisdiction over the "*res*" which the government defines as "rights to the use of water in the Santa Margarita river," and that therefore neither the State Water Rights Board or the Superior Court may exercise any jurisdiction in connection with the res.

■ District courts have original jurisdiction of all actions, suits or proceedings commenced by the United States, 28 U.S.C. § 1345. There is no question of the power of this court to adjudicate the *vested rights* on the river upon the suit of the United States.

The government cites well recognized authorities that full and complete relief in equity should be granted in an action. It then *contends that this court should (1) determine the priority of rights to appropriate the unappropriated water of the river; (2) determine that Fallbrook's applications, by reason of amendments, have become junior to the application of the United States; (3) determine that Fallbrook is acting ultra vires* and does not have the power or authority to appropriate water for irrigation purposes.

(1) *Determining Priority Dates—Not a Judicial Function.*

■ The State Legislature has delegated to the State Water Rights Board, an administrative agency of the State, the quasi-legislative function of determining who shall be permitted to ac-quire a right to appropriate unappropriated water. This function in no way interferes with judicial determination by a court of the vested rights that may exist with respect to the rights of that water. The State Water Rights Board, in its action, makes a determination *subject* to existing vested rights.

The California cases are clear that determinations on applications to appropriate unappropriated water do not constitute a judicial function. In Tulare Water Co. v. State Water Commission, 1921, 187 Cal. 533, 202 P. 874, Chief Justice Shaw in his concurring opinion, pointed out that the State Water Commission (a predecessor of the present State Water Rights Board) could not constitutionally exercise judicial powers. Department of Public Works, etc. v. Superior Court, 1925, 197 Cal. 215, 239 P. 1076, held that the Superior Court had no jurisdiction to entertain a petition for a review, in the nature of certiorari, to review the action of the Department of Public Works, acting through the State engineer, basing its decision on the ground that the Department of Public Works had no judicial power to exercise. (The Department of Public Works and the State engineer, in the statutory set-up of the state, succeeded the State Water Commission, and was likewise the predecessor of the State Water Rights Board.)

This holding has been carried over into the following cases: Mojave River Irr. Dist. v. Superior Court, 1927, 202 Cal. 717, 262 P. 724; Yuba River Power Co. v. Nevada Irr. Dist., 1929, 207 Cal. 521, 279 P. 128; Wood v. Pendola, 1934, 1 Cal.2d 435, 35 P.2d 526; East Bay Municipal Utility Dist. v. Dept. of Public Works, 1934, 1 Cal.2d 476, 35 P.2d 1027; Fleming v. Bennett, 1941, 18 Cal.2d 518, 116 P.2d 442.

In Temescal Water Co. v. Department of Public Works, 1955, 44 Cal.2d 90, 280 P.2d 1, the Supreme court of California reviewed the cases and noted that in the Tulare Water Company case, supra, the function of the State Water Commission was described as "ministerial," and the

East Bay case, supra, where the court had treated the function of the Department of Public Works, as "quasi legislative." The Temescal case considered the statutory changes since Tulare and held that the Department of Public Works in acting upon an application to appropriate water, exercised discretionary functions in a purely administrative capacity. The Court said:

"In carrying out its present duty, the department exercises a broad discretion in determining whether the issuance of a permit will best serve the public interest. Water Code, §§ 1253, 1255. That determination requires an administrative adjudication, which, in any case in which the issuance of a permit is protested, may be made only after a hearing," (44 Cal.2d at page 100, 280 P.2d at page 7).

This District court exercises *judicial power* under Art. 3, Sec. 2 of the United States Constitution. It has no power to perform *quasi-legislative functions,* the type of function delegated by the State of California to the State Water Rights Board. The State legislature of California possesses the power of determining how unappropriated waters in the state shall be handled, and has delegated this part of its legislative function to the State Water Rights Board. It follows therefore, that taking into account the division of the powers of the state and federal government in exercising executive, legislative and judicial functions, that the determination of whether to grant or deny an application to appropriate unappropriated water under state law, is not a judicial function, but a legislative and administrative one.

(2) *A Judicial function is exercised in reviewing the action of the Board*

True, the State Water Rights Board may make an incorrect decision, and thereafter judicial review by mandamus may be available, but it does not follow that the judicial function may be exercised before the State Water Rights

Board has exercised its quasi legislative function. In the Temescal case, supra, 1955, 44 Cal.2d at page 106, 280 P.2d at page 11, the court said:

" * * * A judicial determination as to existing appropriative and riparian rights rests upon the present uses which may be quite different at a later time, and a determination as to the future availability of water necessarily can be only an estimate. A permit itself confers no appropriative rights but fixes the priority of its recipient over subsequent appropriators, Water Code, §§ 1450–1456; it expressly provides that its issuance is subject to vested rights. If the department erroneously concludes that unappropriated water is available to supply an applicant when there is no reasonable expectation of such a supply, the error may be corrected upon a review of the determination. *But a holding that such a danger is so imminent as to justify an independent judicial proceeding to determine the availability of unappropriated water before the department considers an application, would deprive the administrative proceeding of all of its proper functions in the issuance of a permit.* No such danger will be presumed."

The United States seems to argue that the Board, in considering priority dates, and (after considering other factors) arriving at a decision on an application, has exercised a judicial function. This is no more a binding judicial determination of priorities than is the consideration of vested rights, in finding whether unappropriated water exists.

Until the application to appropriate is acted upon by the State Water Rights Board favorably to the applicant, and the issuance of a permit is directed, the applicant has no property right of any kind as against the state. He has an inchoate, incipient, conditional right of procedural priority over later applicants and before seeking judicial relief, he must exhaust the admin-

istrative procedures available before the State Water Rights Board.

### (3) Priority of filing is not the sole factor required to be considered by the Board

Even if we assume that the applicant had a sufficient legal status prior to the issuance of a permit to seek in a court, judicial determination as to the date of his priority of filing, such a determination could not effect the statutory discretion of the State Water Rights Board to grant, deny or condition permits on applications pending before it. The priority of the application is only one factor to be determined by the State Water Rights Board, and it may exercise its discretion in determining whether a permit will issue. The Board's final determination in the exercise of its quasi-legislative authority granted it by the state, is not exercised solely on the basis of the date of an application.

Moreover, the United States application has been rejected and, under California law, rejected applications, no matter how early their time priority, can be no basis for an appropriative right (West's Ann. Calif. Water Code, Sec. 1450).

The dates of the applications are but one of the factors which the State Water Rights Board must consider in deciding among competing applicants. The law gives the Board broad discretion to allow the appropriation of unappropriated water "under such terms and conditions as in its judgment will *best develop, conserve, and utilize in the public interest the water sought to be appropriated*" (West's Ann. Calif. Water Code, sec. 1253) (emphasis added) and also to "reject an application when in its judgment the proposed appropriation would *not best conserve the public interest*" (West's Ann. Calif. Water Code, sec. 1255, (emphasis added). See also Temescal Water Co. v. Dept. of Public Works, 1955, 44 Cal.2d 90, 99–100, 280 P.2d 1. East Bay Municipal Utility Dist. v. Dept. of Public Works, 1934, 1 Cal.2d 476, 480–481, 35 P.2d 1027, 1029, states:

"Clearly, the manner in which the unappropriated waters of the streams of the state shall be distributed among the applicants therefor involves questions of policy, and the Legislature, in the interest of the public welfare, may prescribe reasonable conditions and priorities in such distribution. This is true even though the filing of an application would, under certain conditions, be a sufficient foundation for a justiciable issue as against some other claimant."

### (4) Exhaustion of Administrative Requirement before Judicial Review

There has been no exhaustion of administrative remedies until the State Water Rights Board proceedings have been completed. The requirement that administrative remedies be exhausted before judicial review may be had, is firmly entrenched in both State and Federal law, Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Temescal Water Co. v. Dept. of Public Works, supra, 44 Cal.2d at page 106, 280 P.2d at page 11. In the latter case the court cited and quoted from Abelleira v. District Court of Appeal, 1941, 17 Cal. 2d 280, 292, 109 P.2d 942, 132 A.L.R. 715, a leading California case, which in turn contained numerous authorities in accord, from federal and state cases.

In Rank v. (Krug) United States, D.C. S.D.Cal.1956, 142 F.Supp. 1, at pages 179–181, Judge Hall reviewed the problem and concluded that, under the present California law, an applicant to appropriate unappropriated water, was not entitled to an independent judicial determination of priorities prior to the ruling by the State Engineer (now the State Water Rights Board), in granting or denying permits, and that the administrative remedy must be exhausted before judicial review of the decision might be had.

Should this court review the question of priority dates and determine the relative dates of filing, and deter-

mine that Fallbrook's amendments in substance constituted new applications, junior in time to the United States applications, this would not be the end of the problem. As stated above the administrative procedures outlined by state law, have not been pursued by the United States to their conclusion, since the United States appeared specially at the State Water Board hearing, questioned its jurisdiction and in substance refused to participate or present any evidence; and secondly, the finding of priority dates would not prevent the State Water Rights Board from proceeding to hear and rule on the applications, even though among the factors to be considered was the time priorities of the applications as found by this court under the assumption above.

### (5) The Argument Re Jurisdiction over the "Res" misses the mark.

True, this court has jurisdiction over the rights on the River. But that does not require that it undertake a quasi-legislative function and create, as it were, or allot new rights. Until permit issues no such right exists. When permits issue this court will then determine whether there was surplus water, over and above the vested rights on the River, against which the permit might be operative and meaningful as constituting a "right."

This court is utterly without power to "issue permits" to appropriate water and any determination of priority dates would be an idle and useless act.

That there might be ostensible similarity between the proceedings in the district court to determine vested rights and the proceedings before the State Water Rights Board to determine who should be permitted to secure permits to appropriate unappropriated water, does not answer the problem. The two proceedings are essentially different,— different types of rights are involved.

The case of Pacific Live Stock Co. v. Lewis, 1916, 241 U.S. 440, 36 S.Ct. 637, 60 L.Ed. 1084, is pertinent to this problem. In that case there was pending in the district court two cases involving water rights. Subsequently proceedings were initiated before the State Water Board of Oregon for the adjudication of the relative rights of claimants to the water. Under Oregon law, the Water Board dealt with both vested rights and applications to appropriate water. The plaintiffs in the actions pending in the district court sought to enjoin the state proceeding on the ground it invaded the jurisdiction of the United States courts. The district court dismissed the injunction suit and the United States Supreme court affirmed on the grounds that although there was a similarity between the court actions and the water board proceedings, in that they both concerned, in part, vested water rights, the objective and basic characters of the proceedings were different.

### (6) Collateral Attack Improper.

If the board has decided erroneously or without substantial evidence in approving Fallbrook's applications and rejecting that of the United States, judicial review is available to the United States upon exhaustion of its administrative remedy and the filing of a petition for writ of mandate under West's Ann. California Water Code, section 1360 and West's Ann. California Code of Civil Procedure, section 1094.5, Temescal Water Co. v. Dept. of Public Works, supra. But if the board has acted within its jurisdiction, its decisions are not subject to collateral attack as attempted here by the United States, Stockton v. Department of Employment, 1944, 25 Cal.2d 264, 267–268, 153 P.2d 741.

This District court does not intend to undertake a quasi-legislative function and decide who is entitled to a permit, or decide priority dates of applications to appropriate water, when a priority date is not determinative of entitlement to a permit.

**(7)** *Government's claim that Fallbrook is acting ultra vires is presently for State determination.*

It follows from the foregoing discussion that the question of whether Fallbrook P. U. D. has the power and capacity to appropriate water and build the proposed dam is presently a problem for state agencies. This question might determine whether the permit should issue or the type and extent of such permit, if issued. These issues have not been determined by the State. Since the mandamus action to review the Board's action means a trial de novo, State action is not now final.

If and when State action is final and Fallbrook presents proof in this court of a permit to appropriate water, then the problem of ultra vires may or may not be appropriate for consideration by this court.

It is presently no ground for summary judgment.

The question of Fallbrook's financial ability to build the dam, and the economical feasibility thereof obviously present issues of fact which in any event cannot be decided on the motion for summary judgment.

Many other questions of fact are presented by the motion. The government's motion for summary judgment is denied.

### VIII–B

Defendants Motions to Dismiss and to Strike Certain Counts in Plaintiff's Amended and Supplemental Complaint

Various defendants have made motions to dismiss and/or strike certain counts or portions of counts in the plaintiff's amended and supplemental complaint.

Plaintiff's amended and supplemental complaint is weirdly pleaded. First the original complaint is set forth at Count I in the new pleading. Each additional count incorporates Count I and all succeeding counts and then purports to allege new matter.

At the argument the court indicated there might be some problem as to dismissing counts or striking paragraphs because of the procedure of incorporating by reference outlined above. However, on reflection the court concludes that if a particular count contains nothing actionable in the way of a cause except the incorporated material, the dismissal of the count or the striking of it will not prejudice the United States, since obviously the incorporated material appears in a previous count.

Although various defendants have made motions directed to various counts, all rulings made hereafter will be for the benefit of all the parties. If a count is dismissed or a paragraph stricken on the motion of one party, it is out of the complaint not only for the moving parties but all other parties to this litigation.

### Count II

The count alleges that in answering the original complaint Fallbrook made no reference and no claims pursuant to application #12178 and #12179 filed with the State of California and the subject of the hearing and order before the State Water Rights Board; and that by failing to assert these claims in its answer they have been abandoned by Fallbrook in this litigation and Fallbrook is precluded in this case from asserting any rights based on those applications.

Fallbrook has moved to dismiss and to strike the count.

The motion to dismiss is granted for the reasons elsewhere set forth in this memorandum, particularly in Part VIII–A, when there was discussed the power and procedure of the State Water Rights Board. See also the "Memorandum on Remand" in Case #2147–SD–c.

### Count III

Count III alleges that when this action was filed in 1951, Fallbrook was making no claims to the use of water from the main stream pursuant to applications #12178 and #12179; that these applications were for use of water from Rainbow Creek and Sandia Creek respectively; that since the filing of this action

Fallbrook on July 28, 1952, filed amended application #12178. Fallbrook now seeks 500 acre feet of water annually from Rainbow and 9500 from Santa Margarita River; and that by the amendment to application #12179 Fallbrook seeks 1500 acre feet of water annually from Sandia and 8500 acre feet annually from the Santa Margarita River; that Fallbrook has greatly and drastically increased its demand from the Santa Margarita River.

Fallbrook has moved to dismiss and made a motion to strike. The motion to dismiss is granted for the reasons set forth above in reference to Count II.

## Count IV

Count IV alleges that in connection with Fallbrook applications #12178 and #12179, Fallbrook has undertaken to condemn lands for a dam and reservoir in the Santa Margarita River upstream from Camp Pendleton, and to impound 32,000 acre feet of water annually; that this action has clouded the title of the United States to rights on the river and threatens to invade those rights. Paragraph V of Count IV alleges that Fallbrook has abandoned applications #12178 and #12179 or if they have not been abandoned, that they have lost their priority to claims with a date earlier than July 28, 1952.

Fallbrook has moved to dismiss the count and to strike. The court grants the motion to strike paragraph V of Count IV, for the reason heretofore stated in connection with the motion to dismiss on Count II. The motion to dismiss Count IV is denied, in that the allegations concerning a dam on the river will raise issues for trial and the government obviously has rights on the river which would require protection in any decree from the operation of a dam upstream.

## Count V

Count V alleges that Fallbrook claimed no rights in the river at the time the United States acquired the Rancho or for many years after, but that Fallbrook held a revocable license dated July 20, 1932 from the Rancho as predecessor in interest of the United States, entitling it to receive a small amount of water; that four years after the acquisition by the United States of the Rancho, Fallbrook on October 11, 1946 filed application #11586 with the State of California to appropriate 2½ cubic feet of water per second from the river; that the United States revoked the license on July 31, 1948 and that thereafter Fallbrook "greatly increased its diversion from the Santa Margarita River * * * diverting waters which the United States of America is entitled * * *". The count further alleges in paragraph VI that defendant in intervention, California, through the State Water Rights Board on December 31, 1957, issued Fallbrook a license to appropriate water, No. 4906 based upon application #11586; and alleges in paragraph VII that California has undertaken to change the status of the parties in this case by the issuance of the license and has clouded the title of the United States to the use of water in the river.

Fallbrook and the State of California have filed motions to dismiss and Fallbrook has filed a motion to strike.

The motions to dismiss are denied because of the allegation of diversion by Fallbrook of waters to which the United States is entitled. The motion to strike is granted as to paragraphs VI and VII upon the same grounds as referred to in the court's ruling on Count II herein.

## Count VI

Count VI alleges that the defendant Santa Margarita Mutual Water Company on August 3, 1951, after the institution of this action amended its application #11578 and #12152; that the said amendments envision an increase in the burden on the river and change the applications as originally filed; that the defendant Santa Margarita has clouded the title to the rights of the United States to use the water and has lost its originally claimed priority to appropriate water.

The State of California has moved to dismiss the count. The motion to dismiss the count is granted upon the ground set forth in the court's ruling on Count II above.

### Count VII

Count VII alleges that Fallbrook and Santa Margarita have failed to prosecute with due diligence their applications to appropriate rights to the use of water and permits and construction of their alleged projects and have lost their claimed rights, through laches and are now estopped from claiming such rights in this cause.

Fallbrook and the State of California made motions to dismiss the count and Fallbrook has made a motion to strike The motions to dismiss are granted upon the grounds set forth in the court's ruling on Count II.

### Count X

Count X alleges that California, through its State Water Rights Board, held hearings over plaintiff's objections, on Fallbrook's applications No. 12178 and 12179, and Santa Margarita's applications No. 11578 and 12152, and the Board submitted the matters; (the Board has since acted); that the Board's determination as to whether surplus water exists, puts in issue the right of every claimant on the River; and that the Board had usurped this court's jurisdiction.

California and Fallbrook made motions to dismiss the count and Fallbrook moved to strike it.

The motions to dismiss are granted on the same grounds as stated heretofore as to Count II.

### Count XIII

Fallbrook has moved to strike Paragraph VI of the count on the ground that the matter is redundant, immaterial and impertinent.

The motion is granted. Facts are not alleged. The paragraph is only argument.

### Count XIV

Fallbrook has moved to strike Count XIV on the ground that its contents are redundant, immaterial and impertinent.

The motion is granted. The court contains only a quotation from the circuit decision (235 F.2d 647, 663).

### Count XXI

Count XXI alleges in Paragraph II that the United States and its predecessor in interest have exercised rights to the use of water in connection with the enclave, in excess of the prescriptive period and that the use and diversion of this water by the United States has been open, notorious, adverse, exclusive and under a claim of right against each and every defendant in this case.

In paragraph III of the count, the United States alleges diversion and use of water on Indian reservations, National Forests and Public Domain in excess of the prescriptive period and that such use and diversion has been of the character alleged in the preceding section.

Count XXI, therefore seeks in paragraph II to set up prescriptive rights at Camp Pendleton and in paragraph III prescriptive rights in connection with the upstream land of the United States consisting of public domain, National Forests and Indian land.

To this count, various parties, including the State of California and Fallbrook have filed motions to dismiss.

There is no express allegation that the United States or any one has ever *used the water on or connection with the said lands*. Actual *use* of water for the prescriptive period in connection with specified lands is essential to the acquisition of a prescriptive water right. Northern California Power Co. v. Flood, 1921, 186 Cal. 301, 304, 199 P. 315; Moore v. California Oregon Power Co., 1943, 22 Cal.2d 725, 735–737, 140 P.2d 798.

However, in view of the incorporation by reference of the original

complaint and each of the preceding counts, the allegation has undoubtedly been supplied and at least appears inferentially. In any event if a cause of action is otherwise alleged and proved, the court will permit an amendment to conform to proof, after or during trial, as far as this point is concerned.

The motions to dismiss the count are denied for the reason that in paragraph III of the count, an upstream prescriptive use is alleged and this the government may be able to prove. The court on its own motion strikes paragraph II for the reasons set forth elsewhere in this memorandum in holding that a downstream user may not acquire prescriptive rights against an upstream owner.

Nothing in this ruling shall preclude the United States in attempting to prove, if it can, that some prescriptive right was acquired by the United States, in connection with waters released from the Vail Estate pursuant to the court decree. This matter has not been briefed or considered, and the pleadings are broad enough to permit the United States to claim this right, if by any chance it exists.

## Count XXII

Count XXII deals with *appropriation* and alleges that the United States has since 1942 for beneficial purposes, in connection with the Military establishments in the enclave, appropriated and used under a claim of right, waters from the *surface and sub-surface flow of the River; that such use was an exercise of, and in excess of the exercise of, its riparian rights;* that certain water is used for Military and agricultural purposes both within and outside the watershed and the river.

The United States further breaks down this claim as follows:

(a) A storage right for 4300 acre feet of water annually for Lake O'Neill, alleging that since 1883 the *surface flow* of the River has been and is diverted to fill and refill the lake.

(b) The right to divert from the *surface or sub-surface flow* of the River 4800 acre feet annually for use within and without the watershed with a priority of January 1, 1937; that the diversion and use of this water was commenced by the Rancho (apparently on Jan. 1, 1937) and the United States has exercised the same use and rights since its acquisition of the enclave; that presently the *waters are diverted by pumps from the basin* underlying Camp Pendleton.

(c) A right to divert directly from the *surface or sub-surface* flow of the river 3200 acre feet of water annually; that since 1942 these waters have been *diverted outside the watershed;* that the *predecessor in interest* of the United States diverted and used *within the watershed, large quantities of water in excess of their riparian entitlement* by means of pumping; that from the year 1910 the predecessor in interest of the United States diverted and used annually 3200 acre feet annually, if not more, and United States claims a right to that amount of water with a priority date of January 1, 1910.

Count XXII, various of the defendants, including California and Fallbrook, have filed motions to dismiss.

The count is not artfully drawn, in that it makes no segregation as to appropriative rights acquired under California law prior to Dec. 19, 1914 and rights alleged to have been acquired thereafter. In the previous portion of this memorandum, paragraph VII–H, where we discussed appropriative rights, we limited our discussion to alleged appropriations occurring after December 19, 1914. Our conclusions in that respect will not here be repeated.

Alleged appropriative rights acquired
prior to December 19, 1914
*(1) Beneficial Use*

It is contended by the defendants, Gibbon and Cattle through their attorney, Geo. V. Grover, that "there is no allegation that the waters claimed to have been diverted and stored

in Lake O'Neill were beneficially used or used at all under appropriative procedure existing before 1914. Actual beneficial use was essential to the creation of an appropriative right. Mere storage is by no means the same thing, Bazet v. Nugget Bar Placers, Inc., [1931] 211 Cal. 607–618 [296 P. 616]." We agree. However, at the trial, the court will permit an amendment to conform to proof if the government can show not only that the waters were diverted and stored in Lake O'Neill but were also beneficially used on specified land.

The contention that there is not an express allegation that the *other uses* prior to 1914 in addition to the storage right, were beneficial and were in fact used on specified land will be treated by the court in the same manner and amendment to conform to proof will be permitted if otherwise proper.

(2) *Failure to Allege—Continued Use*

Fallbrook contends that there is not only no allegation of the application of the water to a beneficial use but also that there *is no allegation that the same use has continued to the present time,* citing West's Ann. California Water Code, Sec. 1241 which provides, *"Reversion of unused water.* When the person entitled to the use of water fails to beneficially use all or any part of the water * * * for the purpose for which it was appropriated or adjudicated for a period of three years such unused water reverts to the public and shall be regarded as unappropriated public water."

The same rule was formerly stated in West's Ann. California Civil Code, Sec. 1411*, and has been approved by case law, Lindblom v. Round Valley Water Co., 178 Cal. 450, 173 P. 994; Smith v. Hawkins, 110 Cal. 122, 42 P. 453; Akin v. Spencer, 21 Cal.App.2d 325, 69 P.2d 430; Haight v. Costanich, 184 Cal. 426, 194 P. 26.

The matter will be handled by amendment to conform to proof, if otherwise proper.

(3) *Substituted Use of Water*

From paragraph III(c) of the count it appears the United States is claiming the right to substitute uses, alleging that from 1910 to 1942 the plaintiffs' predecessor diverted and used the water *within the watershed* and that since 1942 the plaintiff has diverted and used the water *outside the watershed.*

Fallbrook contends that if there were a valid appropriation existent from 1910 to 1942, the same has been forfeited and the water rights reverted to the public, by reason of the change in place and character of the use.

■■■ In this respect Fallbrook is in disagreement with the position of the State of California. The State of California contends that if upon the acquisition of the Rancho the United States succeeded to a valid appropriative right which the Rancho had acquired by a non-statutory appropriation prior to 1914, United States may retain that right, even though the place of use and the purpose of use, were changed; that as long as there had not been a cessation of the use for the statutory period, as long as the same amounts of water continued to be diverted at the same times as originally, a change in the place of use or purpose of use would not result in a forfeiture or abandonment of the original right, citing West's Ann. California Water Code, Sec. 1706; that therefore if the appropriative right was acquired, by diversion and use of the water *within the watershed,* then the United States could change the place of use to a point *outside the watershed.* We are in accord with and hold with the contention of the State of California.

(4) *Appropriation versus Riparian Use*

■■■ Diversion and beneficial use by a riparian owner on his riparian land

* Now West's Ann.Cal.Water Code, § 1240.

of even the entire flow of the stream to which his land is riparian during periods when the other riparians on the stream have no use for the water, are an exercise of his riparian right, Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 555, 81 P.2d 533; Joerger v. Mt. Shasta Power Corp., 1932, 214 Cal. 630, 637, 7 P.2d 706; Half Moon Bay Land Co. v. Cowell, 1916, 173 Cal. 543, 549, 160 P. 675; Gould v. Eaton, 1897, 117 Cal. 539, 543, 49 P. 577, 38 L.R.A. 181. That being so, such diversion and use cannot constitute the appropriation of water. While a riparian owner is not disqualified from being an appropriator also, the same use cannot be both an exercise of the riparian right and an appropriation.

This is essentially a question of fact to be determined at the time.

### (5) Use of Riparian Water outside the Watershed

In the sense that there is any assertion in Count XXII, of a right to use water outside the watershed by virtue of riparian rights, this matter has been disposed of by prior parts of this memorandum.

The motions to dismiss Count XXII are denied. At the trial the court will rule in accordance with this memorandum unless a contrary rule is required by controlling precedents.

### Count XXIV

Count XXIV alleges that June 30, 1948, application 12576 was filed with the State of California by one Cochrane, "United States Navy Department" describing the project for storing annually 165,000 acre feet of water; that the application was amended on December 13, 1948, seeking the annual use of 12,540 acre feet of water; that the application was amended on July 13, 1949 "For diversion to be stored temporarily and later applied to beneficial use, 165,-000 * * * acre feet per annum, to be collected between 1 October and 30 April of each season;" that the United States claims this storage right with

priority of June 30, 1948, "to be exercised to the extent of its demands, not met by the other rights claimed by it * * * *" To this count the defendants Cottle and Halde have moved to dismiss. The motion is granted for the same reason set forth under Count II.

Nothing in this ruling shall prejudice the United States to any rights arising under the Utt Bill, providing for a dam on the River.

### Count XXV

The count alleges that the claims of the United States exceed the supply of water in the River; that defendants assert adverse claims which cloud the title to the rights of the United States; that defendants invade and are threatening to invade the rights of the United States.

The balance of the count, page 38 lines 15 to 24, allege that the State of California has asserted claims adverse to the United States; that the State of California has through its acts "drastically changed its status and the status of the parties since the institution of this action. * * * *"

California has moved to dismiss. Lines 15 to 24 without question refer to the action of the State Water Rights Board. We have held such matter is not here in issue. The first part of the count is typical of quiet title pleading and could well have been set up in the first cause.

Accordingly the motion to dismiss is denied. The court sua sponte, strikes lines 15 to 24, page 38 from count XXV.

### Appendix A

Summary of Testimony Offered by the United States at Hearing on May 22, 1958, Concerning Surrounding Circumstances and Intentions of the Parties at the Time of the Execution of the Stipulation of November 29, 1951.

B. Abbott Goldberg, Deputy Attorney General, State of California, testified as follows: that his most recent water case was the Ivanhoe case (Ivanhoe Irrigation

District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313), and that he was associated in that case for the State of California with Moscovitz. That he had frequently seen Moscovitz since May, 1957. He did not recall that they ever had an actual conference on the Fallbrook case, but in the course of a conversation with Moscovitz, he stated to Moscovitz that he disagreed with the position Moscovitz was taking in the Fallbrook case. That Goldberg brought to his superior's attention his views in regard to California interpretation of the stipulation of November 29, 1951; that he stated to Mr. Brown, Attorney General, that in his opinion the stipulation *was intended* to refer only to the quantity of water which the government was entitled, and the question of the use of the word "paramount" in the complaint.

The court at this point, (p. 1226) pointed out that so far this testimony was only window dressing; that what the witness subsequently told the Attorney General had no bearing on the question of the situation at the time the stipulation was entered. Mr. Veeder agreed. Mr. Goldberg was then questioned as to his recollection of the circumstances leading up to the execution of the stipulation. He thought he was at Camp Pendleton once, in August of 1951 and viewed the properties. Mr. Shaw was not present. Some time in November Mr. Shaw was put in charge of the Fallbrook case; that Goldberg was aware "of the use of water by the Marines at Camp Pendleton." That there was discussion about the fact that the United States was taking water out of the water shed and the State of California was fully apprised of that fact (p. 1230); that he does not recall whether, in the preparation of the pleadings for the State of California, he raised the issue of the necessity of the United States to comply with the laws of the State of California. That there was a discussion as to whether the United States had to make a filing with the State of California *before it diverted*

*water out of the water shed,* which discussion took place in the office of the Attorney General, Mr. Brown in Los Angeles; that Mr. Shaw and Mr. Brown were present with Lawrence or Loren Wright representing the Vail interests; that Mr. Veeder and Mr. Turnbull and Mr. Goldberg were present, "that there was a discussion as to the meaning of the word 'sovereign'" and at this time the stipulation of November 29th had not been drafted; that he has a prior draft of the stipulation; that the discussion with reference to the word "sovereign" came down to this, "that the United States could act only in its sovereign capacity." There was a discussion for the need of distinguishing between the property interest of the United States on the one hand and the right of the United States to deal with that interest once it had acquired it. (p. 1236). That Mr. Veeder stated the United States could acquire a property right similar to the right a private person has, but once it deals with a property, it acts only in a sovereign capacity. That the witness was under the impression to start with, that the United States could act either in a proprietary or a sovereign capacity similar to the situation under State law. The meaning of the parties who executed the stipulation was that the United States could and did and does hold only as a sovereign in this case. (p. 1237). That there was no intimation by Mr. Veeder that the United States would abandon any rights to the use of water or that it would lose any rights to the use of water by the execution of the stipulation of November 29, 1951; that it was the position taken by Mr. Veeder that the United States would not abandon its rights that resulted in the insertion of the words, "prescription and use"; that as to the matter of compliance of the United States with State law in connection with the *diversion of water out of the water shed,* the question was left open as to whether the United States had a right to take water out of the watershed. That the United States did not agree to

file an application with the State of California (p. 1238); that the use of the word "paramount" was important in connection with placing a quantitative limit on what the government was claiming. There had been a sort of sinister implication that the United States, by virtue of its sovereignty, was going to take the valid rights without paying for them, so it became important to put a quantitative limit on what the United States was claiming, and that was his understanding of what the purpose of the stipulation was. (p. 1239).

"We were aware that the United States was taking water out of the water shed. We were also under the impression at that time—*I have been told that it has been changed since*, but we were under the impression at that time that the United States was claiming only its riparian rights or the riparian right that it had succeeded to when it acquired the Rancho, and a question was, how are you going to put a quantitative limit on those riparian rights? *That was my understanding of the word 'measure,' that the riparian quantity would be measured in accordance with the law of the State of California,* although the stipulation was not intended to settle the question whether the United States had the right to take that riparian quantity out of the water shed or not. There were two problems that were in our minds: (1) the effect of the cession of jurisdiction, and (2) *does anybody upstream have the right to object to what the downstream riparian does within the limits of the riparian quantity?* Those questions were not intended to be precluded by the stipulation.

"The Court: In other words, then, the question of the right of the Government to take the water after it got on the enclave out of the watershed is not, in your opinion, foreclosed or thereby foreclosed by the stipulation?

"The Witness: That is right. * *

"Q. By Mr. Veeder: Now, Mr. Goldberg, in regard to the question of the meaning of the word 'measure,' did you interpret the word 'measured' to mean that even though the United States was then diverting water outside of the water shed that it would make a filing with the State of California and thus initiate a right to appropriate water in accordance with the laws and procedures of California? A. No.

"Mr. Moskovitz: I object to that question, your Honor. The question was, 'Did you interpret * * *?' I don't think his interpretation is important. I think that is certainly irrelevant.

"Mr. Veeder: I certainly think the whole question of calling Mr. Goldberg is to find what was the parties' intention and interpretation at the time that this matter was signed.

"The Court: It is an immaterial matter. That is not the question you asked. You asked the broad question how he interpreted it. You didn't say when and where. If you want to ask him prior to the time or at the time of the signing of this what he thought the stipulation meant, what his intention was, why don't you ask him. But as to these shotgun questions, he may have given a dozen interpretations since the date that this was signed.

"Mr. Veeder: I will reframe it, your Honor.

"Q. When the word 'measured' was written into the stipulation, Mr. Goldberg, was your understanding that it meant that the United States of America, even though using water out of the water shed, at that time would agree to make a filing with the State of California so as to get a permit to divert that water?

"Mr. Moskovitz: Your Honor, I object again, and let me explain a little more. *The unexpressed understandings of parties to negotiations of an agreement have no relevance whatsoever.*

"The Court: What was said, and what was done?

"Mr. Moskovitz: What was said and what was done. On that basis I object to the question.

"The Court: In other words, how would a man's secret intention or secret

interpretation have any bearing, unless he did something to express it?

"Mr. Veeder: Well, I think he did, but I will ask him some more questions.

"Q. Mr. Goldberg, at the time of the execution of the stipulation and the use of the word 'measure,' did you know yourself that water was being diverted out of the water shed of the Santa Margarita River by the United States of America? A. Yes.

"Q. Mr. Goldberg, did I ever at any time indicate that I would recommend or that the United States of America would make a filing in accordance with the laws of the State of California to permit us to divert that water out of the water shed? A. No.

"The Court: In the same connection, let me ask now: At that time, before the stipulation was signed, did you or any officer of the State of California ever say to Mr. Veeder that the Government had the absolute right to divert that water out of the water shed without a filing?

"The Witness: No.

"The Court: In other words, nothing was said either way about it?

"The Witness: That is right. That is what I mean, your Honor, when I say that these questions were not concluded by this stipulation." * * *

"Q. By Mr. Veeder: Mr. Goldberg, on the date of the stipulation, the day that the stipulation was entered into, and prior to that date, do you recall any conversation with me in regard to the necessity of making a filing with the State of California? A. Yes.

"Q. Before we could divert water out of the water shed? A. Yes.

"Q. And would you state your recollection as to the statements that I made on the day of the execution of the stipulation and prior to that time as to the question whether the United States would make a filing with the State of California?

"The Court: Give us the foundation, first. Where did the conversation take place? Who was present?" * * *

"Q. By Mr. Veeder: On November 29, 1951, do you recall the conversations in regard to the compliance with the State law before water could be diverted out of the water shed? A. I can't pinpoint to that day, Mr. Veeder.

"The Court: Do you recall any conversation where you can tell us who was present and where it took place, where something was said about that, prior to the date of the signing?

"The Witness: Well, I had various conversations with Mr. Veeder about that time—I can't state with precision whether it was prior to the date of the signing or shortly after the signing, and the reason for my difficulty there is that we had a hearing in San Diego on December 3, 1951, very shortly after the stipulation was filed, and we discussed the matter at that time and I can't disentangle in my mind whether we talked about it then or talked about it before. But certainly the matter was discussed.

"The Court: Do you remember who was present?

"The Witness: No.

"The Court: What did you say and what did Mr. Veeder say?

"The Witness: I don't think I said much of anything. Mr. Veeder said that he believed that the United States was not required to file applications for permits to appropriate, because the Water Code is a statute of a police character which is not binding on the United States.

"Q. By Mr. Veeder: In regard to the use of the word 'measured,' on the day that the stipulation was executed or at the time immediately antecedent to that, do you recall that I stated that when we used the word 'measured' it would mean that we would make a filing with the State of California?" * * *

"The Witness: The answer is no.

"The Court: Did Mr. Veeder state, at that same time and place, that he

would not make a filing with the State of California?

"The Witness: He insisted on the right of the United States to appropriate without a filing.

"The Court: Did he say that he would not make a filing?

"The Witness: Your Honor, I can't say that he used those very words, but in substance it is, yes, that he said that the United States didn't have to file." * * *

"The Court: Who drafted this final stipulation?

"The Witness: I think Mr. Shaw did, but again it was a group effort.

"The Court: You mean that Mr. Veeder didn't?

"The Witness: No, my recollection is that the principal draftsman was Mr. Shaw." * * *

"The Court: It was a joint effort; you all had a hand in it? Is that right?

"The Witness: Yes, Sir." * * *

"Q. By Mr. Veeder: Mr. Goldberg, at the time when the stipulation was executed, was there any statement by Counsel for the United States that it would stipulate to comply with the laws of the State of California? A. No.

"Q. And was there ever a statement by anyone with whom you dealt in connection with this stipulation and on the day that the stipulation was executed that the United States would comply with the laws of the State of California? A. As I recall, Mr. Veeder—this is based again on this prior draft. We had an initial version or an earlier version—I don't know whether it was the initial one, but we had an earlier version that stated that such rights, that is, the rights to which the United States was laying claim, that such rights are defined and measured in accordance with the law of the State of California, and at your insistence the word 'defined' was stricken and we were left with the word 'measured' alone, which I think you related to the question of beneficial use —that you had acquired the right, that

the law of California grants no water right unless the water is put to use beneficially, and that you were referring to the law of California in that sense." * * *

*Cross Examination*

"Q. Can you explain what the word 'measure' referred to with respect to the variety of rights that were being discussed at that time? * * *

"The Witness: Well, as far as we were aware what riparian rights were, yes, the riparian rights and also the fact that the water is being taken out of the watershed, the word 'measured,' I thought, was used to cover two situations; as to the riparian rights, that the quantity necessary for those riparian rights would be determined by determining the riparian land which the Government had acquired and determining the uses on those riparian lands, and with regard to other rights that the quantity would be determined by the amounts that had been applied to beneficial use.

"Q. By Mr. Moskovitz: Was there discussion in connection with the use of the word 'measured,' on riparian rights as to where the quantity of water to which those riparian rights pertained would be used? * * * A. Yes, there was discussion about it, and the stipulation was intended to be drafted so that the question of the Government's right to take the riparian water out of the water shed was not concluded by the stipulation; that all the stipulation did was define the quantity but did not relate to the Government's right to deal with that quantity.

"Q. Did the United States' representatives assert then a claim of right to take that riparian water and use it outside of the water shed? A. Yes.

"Mr. Moskovitz: Now, let me see if I understand this. When you gentlemen were sitting around the table before this stipulation was signed, did you talk about the fact that California law on the law of riparian rights would probably control this lawsuit?

"The Witness: We talked about the problem, your Honor, of (1) defining the United States' property interest and (2) what we thought to be a different problem. I find it necessary to say that I'm not trying to argue the merits of this thing. I'm simply trying to recall what we were talking about then. We had in mind two different things: (1) the property which the United States had acquired, the quantum—that is to what the stipulation referred, and (2) the United States' right to deal with that quantity, take it out of the watershed, specifically, and that is what the stipulation did not refer to—that was the question that was left open.

"The Court: In other words—this may be an improper question and anybody can object—it is your recollection that the purpose of the stipulation at its execution was not to foreclose the United States on a contention that it might still take this water out of the watershed?

"The Witness: That is right.

"The Court: That was left open?

"The Witness: Yes.

"The Court: Did representatives of the State of California say that it was clear that the Government had a right to take this water out of the watershed?

"The Witness: No, we didn't say it was clear that they had a right to do it. That was a question.

"The Court: In other words, it was just a problem?

"The Witness: Yes.

"The Court: And it was left open?

"The Witness: Yes. Your Honor, if I may, we have actually a contemporaneous memorandum of what this was about in the hearing which was held on December 3, 1951, and I asked the Clerk to bring that transcript here. I have gone through it this morning, and for whatever it may be worth, there are statements in that as to what this stipulation meant.

"The Court: Is the transcript here?

"The Witness: Yes.

"(The clerk hands a document to the Court).

"The Court: Well, it is 97 pages. It was a hearing held on December 3, 1951. Is there any objection, for what it is worth, to having it in the record?

"Mr. Veeder: No, your Honor.

"Mr. Moskovitz: Not at all, your Honor.

"The Court: Nothing could be added to or detracted from it now.

"Mr. Veeder: I'm in favor of it. I hope that I argued·vehemently on the matter.

"The Court: Is this part of the files in this case now?

"The Witness: I think it is. I acquired it from the Clerk.

"The Clerk: Yes, it is on file downstairs, your Honor.

"The Court: Well, incorporate by reference the transcript of proceedings held on December 3, 1951." * * *

Appendix B

Statement by Veeder and Goldberg at Hearing on December 3, 1951, Five Days after the Execution of the Stipulation of November 29, 1951.

"Mr. Veeder: We think that the question of exclusive jurisdiction is of extreme importance. We stated to your Honor and agreed in our earlier arguments that *we do not claim the cession of jurisdiction gave us any more water than we bought and paid for, with the Rancho Santa Margarita*. It is of extreme importance as to whether the State police power would regulate the place of use, means of use and similar questions. Those have been resolved by the stipulation. * * *

"* * * they (the defendants) alone seek to take from the water shed of the Santa Margarita the waters which the United States asserts it bought and paid for * * *

"Mr. Goldberg: As we understand the issue on the question of exclusive jurisdiction, it comes down to this. *We have two questions here: 1. the quan-*

*tity of water and, 2. the right to use that water after it hits the military reservation. By the stipulation the first question as to the quantity of water is settled. The government will obtain that quantity measured in accordance with State law.*

"The next question is that quantity which it avers as a riparian user is that limited to use on riparian lands and what is the effect of the cession of exclusive jurisdiction on that limitation which would otherwise exist.

"I am not prepared now to express an opinion on that question but, as I understand it, that is the question we will settle by a trial on the issue of exclusive jurisdiction." * * *

Mr. Swing then commented on the stipulation and the word "measured" in the presence of Mr. Veeder and Mr. Goldberg.

"It (the stipulation) says measured. It doesn't mean to take a tape measure. It means restricted, controlled, denied, in accordance with the laws of the State of California, if it means anything." * * *

Mr. Veeder, in rebuttal, made no comment or about the word "measured".

"Mr. Veeder: There is no question there but that the Attorney-General of the State of California and Arvin Shaw, his chief assistant, agreed completely to this stipulation and *by which there was laid to rest every question with the State of California but the question of the threat and the effect of exclusive jurisdiction.*

"The question as to why this is important to have the question of exclusive jurisdiction tried out is to *determine the effect of a sovereign, the United States, having complete exclusive control over the water once that it passes into the boundaries of Camp Pendleton.*

"The Court: What do you mean by 'control'?

"Mr. Veeder: By that we mean the commandant of the Marine Corps, who is running Camp Pendleton, is not subject to control by the State Engineer.

We say that and it is highly important. The change of places of use must go on at all times in the administration of the Camp. (I should say officially subject to the control of the State Engineer.) (?) It is a matter of great significance and it is the background upon which we must consider the entire matter.

"The Court: What does it have to do with the extent of the water rights?

"Mr. Veeder: We say, your Honor, it has nothing to do with the extent of the water rights but it is certainly true that in the administration of the water rights and we are seeking a decree here to delineate our powers, we must know whether the State police power and State Engineer have control over us. We state that the Fifth Amendment protects every single water right user on that stream against an enlarged use. *We bought and paid for certain water rights in May and they are those we bought and paid for. How do we use them, is the next thing.*

"The Court: How do you reconcile that situation with the stipulation you entered into?

"Mr. Veeder: *We entered into the stipulation which reflects only in so far as the question of the quantities of water is concerned. The measure of our rights is measured by the laws of California.* Suppose we went out and bought forty acres of land. The characteristics of the rights we bought in that land would be governed by the laws of the jurisdiction in which that property was situated but I submit that in regard to the use of that land the United States is free from control. We cannot put a greater burden on the stream or take anything from any individual but we are not subject to police control in the use of that water." * * *

Mr. Veeder then quotes Mr. Swing and proceeds with his argument. Mr. Swing had stated—

"Once the corpus of the water passes into the boundaries of the Rancho Santa Margarita, the corpus can be done with as they please but the corpus arriving

inside of the government's possession is one thing and the use of the right to go up sixty miles on the stream is something entirely different.

"Mr. Veeder: We agree. But there is a proposition there and it is highly important to us. *It is not that we can go up the stream and make any demand above and beyond what we bought and paid for* but it is very important to us how that water can be used. And we assert that the fact that there has been a cession of exclusive jurisdiction in the use of that water * * *

"Mr. Veeder: The cession of exclusive jurisdiction couldn't possibly convey to us any rights. It does have the effect of administering the water." * * *